IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL MITIGATION BANKING ASSOCIATION; LAND AND WATER RESOURCES, INC.; WETLANDS MITIGATION OF ILLINOIS, L.L.C.; and WETLANDS RESEARCH, INC. | ) ) ) ) ) | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF PLAINTIFFS** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil No. 06 C - 2820 |
| UNITED STATES ARMY CORPS OF ENGINEERS; COL. GARY E. JOHNSTON, in his official capacity as District Engineer of the Chicago District; and MITCHELL A. ISOE, in his official Capacity as Chief of the Regulatory Branch of the Chicago District, | ) ) ) ) ) ) ) | Hearing Date: TBA Time: TBA Courtroom: 1925 Judge: Honorable Joan H. Lefkow |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. **II**

**TABLE OF ACRONYMS** .................................................................. **V**

**INTRODUCTION** ............................................................................. **1**

**SUMMARY OF ARGUMENT** ........................................................... **5**

**FACTS** ................................................................................................ **6**

**GOVERNING LAW** ......................................................................... **19**

**ARGUMENT** ..................................................................................... **22**

    I.   THE CORPS FAILED TO COMPLY WITH NEPA ........................................ 22

        *A.   THE CORPS' ENVIRONMENTAL ASSESSMENT IS INADEQUATE* ....................... *23*

        *B.   THE CORPS DID NOT INDEPENDENTLY ASSESS ENVIRONMENTAL IMPACTS* *24*

           1.   The Record Does Not Demonstrate That The Corps Adopted The FAA Final EIS . 24

           2.   The Corps Failed To Independently Assess The FAA Final EIS ............................ 25

        *C.   NEITHER THE FAA EIS NOR THE CORPS EA ARE ADEQUATE UNDER NEPA* .. *25*

           1.   The Corps Failed To Provide Sufficient And Accurate Information On Mitigation Under NEPA ....................................................................................................... 26

           2.   Neither The FAA EIS Nor The Corps EA Address Adequate Alternatives Regarding Impacts To Wetlands ....................................................................... 28

    II.   THE CORPS FAILED TO COMPLY WITH THE CWA ................................... 30

        *A.   THE CORPS FAILED TO CONSIDER ALTERNATIVES AS REQUIRED UNDER THE CWA AND ITS REGULATIONS* ................................................................. *30*

        *B.   SELECTING IN-LIEU FEE AS MITIGATION WAS ARBITRARY CAPRICIOUS AND INCONSISTENT WITH LAW* ............................................................... *33*

           1.   The Corps' Approval Of The OMP In-Lieu Fee Was Arbitrary ............................ 33

           2.   The Corps Failed To Follow Applicable Mitigation Standards ............................ 34

               a.   The OMP Mitigation Had To Be Approved As Mitigation Bank ....................... 35

               b.   The OMP Mitigation Fails To Satisfy Mitigation Criteria .................................. 36

               c.   The OMP In-lieu Fee Does Not Qualify As An Umbrella Arrangement ............ 41

        *C.   THE CORPS HAD ALTERNATIVE MITIGATION AVAILABLE THAT SHOULD HAVE BEEN SELECTED* ................................................................. *43*

        *D.   THE RECORD REFLECTS PRESSURE ON THE CORPS TO MEET A PRE-ESTABLISHED SCHEDULE FOR PERMIT ISSUANCE* ................................... *44*

**CONCLUSION** ................................................................................. **46**

# TABLE OF AUTHORITIES

## Cases

*Airport Communities Coalition v. Graves*, 230 F. Supp. 2d 1207 (W.D. Wash. 2003) ......... 30, 32
*Airport Neighbors Alliance v. U.S.*, 90 F.3d 426 (10th Cir. 1996) ................................................ 29
*Alliance for Legal Action v. Corps*, 314 F. Supp. 2d 534 (M.D. NC 2004) .................... 29, 32, 34
*Alschuler v. Department of Housing and Urban Develop.*, 686 F.2d 472 (7th Cir.1982)............ 19
*Anacostia Watershed v. Babbitt*, 871 F. Supp. 457 (D.C. Cir. 1994) .......................................... 25
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 19
*City of Bridgeton v. FAA*, 212 F.3d 448 (8th Cir. 2000)............................................................. 29
*City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142 (9th Cir. 1997)..................................... 26
*Environmental Defense Fund v. Froehkle*, 473 F.2d 346 (8th Cir. 1982) ................................... 27
*Friends of the Earth v. Hall*, 693 F. Supp. 904 (W.D. Wash. 1988) ........................................... 27
*Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257 (10th Cir. 2004) .............................. 31
*Highway J Citizens' Group v. Mineta*, 349 F.3d 938 (7th Cir. 2003) ......................................... 28
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 20
*National Wildlife Federation v. Whistler*, 27 F.3d 1341 (8th Cir. 1994)..................................... 31
*Nor-Am Agric. Prods., Inc. v. Hardin*, 435 F.2d 1133 (7th Cir.)................................................. 19
*Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225 (7th Cir. 1975) .......................... 20
*Rhodes v. Johnson*, 153 F.3d 785 (7th Cir. 1998)........................................................................ 35
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).................................... 26, 27
*Scaife v. Cook Cty*, 446 F.3d 735 (7th Cir. 2006)....................................................................... 19
*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................................................. 1
*Sierra Club v. Flowers*, 423 F. Supp. 2d 1273 (S.D. Fl. 2006) ................................................... 26
*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992).................................................................... 28
*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997)...................... 20, 26, 28
*Suburban O'Hare Commission v. Dole*, 787 F.2d 186 (7th Cir. 1986) ........................................ 29
*Utahns for Better Transportation v. DOT*, 305 F.3d 1152 (10th Cir. 2002) ........................... 1, 31
*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) .......................................................... 23, 29
*Windsor v. U.S.*, 419 U.S. 938 (1974) ......................................................................................... 22

## Statutes

5 U.S.C. § 551 *et seq.*..................................................................................................................... 5
5 U.S.C. § 706(2)(A).................................................................................................................. 19, 35
5 U.S.C. § 706(2)(D)..................................................................................................................... 19
23 U.S.C. § 103(b)(6)(M) ................................................................................................................ 2
23 U.S.C. § 133(b)(11) .................................................................................................................... 2
33 U.S.C. § 1251 (a)(2).................................................................................................................. 20
33 U.S.C. § 1251 *et. seq.*............................................................................................................... 20
33 U.S.C. § 1344............................................................................................................... 1, 2, 20
33 U.S.C. § 1344(e)....................................................................................................................... 36
33 U.S.C. § 1362(6)....................................................................................................................... 20
42 U.S.C. § 4321 *et. seq.*.......................................................................................................... 20, 46
42 U.S.C. § 4332(2)(C).................................................................................................................. 20
49 U.S.C. § 47171(a)(2)................................................................................................................. 45
49 U.S.C. § 47171(i)...................................................................................................................... 46
49 U.S.C. § 47171(j)...................................................................................................................... 33
49 U.S.C. § 47171(k)...................................................................................................................... 29

## Regulations

33 C.F.R. § 7 ........................................................................................................... 23

33 C.F.R. § 230.21 ................................................................................................. 25

33 C.F.R. § 320.4(b) .............................................................................................. 21

33 C.F.R. § 320.4(r) ............................................................................................... 21

33 C.F.R. § 325 Appendix B, Section 8.c ............................................................. 25

33 C.F.R. § 325, App. B ......................................................................................... 23

33 C.F.R. § 325.3(a) ............................................................................................... 28

40 C.F.R. § 230.10(a) ...................................................................................... passim

40 C.F.R. § 230.10(a)(3) ........................................................................................ 21

40 C.F.R. § 230.10(d) ............................................................................................. 21

40 C.F.R. § 230.3(q-1) ...................................................................................... 21, 23

40 C.F.R. § 230.41 ............................................................................................ 21, 23

40 C.F.R. § 230.70-77 ............................................................................................. 21

40 C.F.R. § 1500.2 .................................................................................................. 20

40 C.F.R. § 1501.4 .................................................................................................. 23

40 C.F.R. § 1501.4(e)(2) ........................................................................................ 24

40 C.F.R. § 1501.7(a)(5) ........................................................................................ 24

40 C.F.R. § 1502.14 .......................................................................................... 20, 29

40 C.F.R. § 1502.14(f) ........................................................................................... 27

40 C.F.R. § 1502.16 ................................................................................................ 20

40 C.F.R. § 1502.16(h) ........................................................................................... 27

40 C.F.R. § 1505.2(c) ............................................................................................. 27

40 C.F.R. § 1506.3 .................................................................................................. 25

40 C.F.R. § 1506.5 .................................................................................................. 25

40 C.F.R. § 1508.20 ................................................................................................ 20

40 C.F.R. § 1508.25(b)(3) ...................................................................................... 27

40 C.F.R. § 1508.9(a)(1) ........................................................................................ 23

## Rules

FED. R. CIV. P. 56(c) ............................................................................................... 19

## Federal Register Notices

Compensatory Mitigation for Losses of Aquatic Resources: Proposed Rule, 71 FED. REG. 15519 (Mar. 28, 2006) ................................................................................................ passim

Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 FED. REG. 58605 (Nov. 28, 1995) ........................................................................................ passim

Federal Guidance on the Use of In-Lieu Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, 65 FED. REG. 66913 (Nov. 7, 2000) ....................................................................................... passim

Issuance of Nationwide Permits, 67 FED. REG. 2019 (Jan. 15, 2002) ......................................... 36

## Other Authorities

Corps of Engineers, *Chicago District 2004 Mitigation Requirements* (2004) ...................... 22, 34

Corps Of Engineers, *Interagency Coordination Agreement On Wetland Mitigation Banking Within The Regulatory Boundaries Of Chicago District* (Jan. 1997) ...................................... 22

Environmental Law Institute, *Status and Character of In-Lieu Fee Mitigation in the United States* (2006) ................................................................................................................. 3, 4

GAO, *Wetlands Protection: Assessments Needed to Determine Effectiveness of In-Lieu-Fee Mitigation*, GAO-01-325 (May 4, 2001) ....................................................................... 3, 4, 37

NAS, *Compensating for Wetland Losses Under the Clean Water Act* (2001) .............. 3, 4, 34, 45

Regulatory Guidance Letter 02-02, Guidance on Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps Regulatory Program Pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899 (Dec. 24, 2002)........... 22, 40

Society of Wetlands Scientists, *Wetland Mitigation Banking* (Feb. 2004)..................................... 2

## TABLE OF ACRONYMS

APA –         Administrative Procedure Act

CEQ –         Council on Environmental Quality

City –        City of Chicago

Corps –       United States Army Corps of Engineers

CWA –         Clean Water Act

DEIS –        Draft Environmental Impact Statement

EA –          Environmental Assessment

EIS –         Environmental Impact Statement

ELI –         Environmental Law Institute

EPA –         United States Environmental Protection Agency

FAA –         Federal Aviation Administration

FEIS –        Final Environmental Impact Statement

FONSI –       Finding Of No Significant Impact

FWS –         United States Fish and Wildlife Service

GAO –         Government Accountability Office

ICA –         Interagency Coordinating Agreement

IEPA –        Illinois Environmental Protection Agency

ILF –         In-Lieu Fee

MRT –         Mitigation Review Team

NAS –         National Academy of Sciences

NEPA –        National Environmental Policy Act

NMBA –        National Mitigation Banking Association

OMMA –     O'Hare Modernization Mitigation Account

OMP –      O'Hare Modernization Project

RGL –      Regulatory Guidance Letter

ROD –      Record of Decision

WMI –      Wetlands Mitigation of Illinois

Plaintiffs, the National Mitigation Banking Association ("NMBA") *et al.*, seek summary judgment on their First Amended Complaint. Defendants, the U.S. Army Corps of Engineers *et al.*, ("Corps") issued Permit 200301000 without complying with governing law requiring mitigation for impacts to wetlands and waters of the United States. The Corps should be ordered to revise its permit decision to comply with the law.

## INTRODUCTION

Plaintiffs filed this lawsuit to assure that there is lawful off-site mitigation for the wetland and stream impacts authorized for the O'Hare Modernization Project ("OMP").[1] Plaintiffs have interests in the wetlands impacted, the regional water quality and the overall success of wetland mitigation. The Corps' permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, provides mitigation for the 97.1 acres of impacts to wetlands and streams under Corps jurisdiction by authorizing purchase of 62.26 acres of mitigation credits from Lily Cache Wetland Mitigation Bank ($4,544,980.00) and an "in-lieu fee" payment to CorLands for identification and implementation of 280.14 acres of off-site mitigation in the future ($26,466,429.00.)[2] While the mitigation bank credits provide actual mitigation, the 280.14 acre in-lieu fee arrangement is uncertain mitigation, "on paper only," which violates the law. The Corps erred in authorizing the in-lieu fee arrangement, which does not provide adequate compensation for the destroyed wetlands and streams.

---

[1] Facts material to this case are found in the Corps' Administrative Record and the pleadings. The Corps provided Plaintiffs with an electronic copy of its Administrative Record for this permit decision, with some documents bates numbered. However, the Corps did not provide bates numbers for emails in its Administrative Record. Plaintiffs assume that the Corps will provide the Administrative Record to the Court. In this brief, Plaintiffs identify record document by bates numbers and identify the unnumbered emails by date and other identifying information. Plaintiffs have provided the Court with a copy of all of the record documents that are cited in this brief. For lengthy documents, pertinent sections of the documents are provided.

[2] *See* AR-0020675-82, AR-0020677.

The choice of wetland and stream mitigation is very important. The government has recognized three systems that may, under appropriate circumstances, be used to perform mitigation.[3] The mitigation can be undertaken by the permittee ("permittee mitigation"), who remains liable after permit issuance for achieving the mitigation. The Corps can utilize its full range of enforcement powers to compel performance of the mitigation, including suspending or revoking the permit or otherwise penalizing the permit holder if it fails to complete required mitigation.

Mitigation banks may also provide mitigation ("mitigation banking").[4] A mitigation bank is approved in advance of any specific wetland impacts, under strict rules that require implementation of mitigation at specific sites, development of mitigation plans, securing of land and provision of financial security for implementation of the mitigation and for long term maintenance. Once approved, a mitigation bank is authorized by the Corps to sell credits based on the actual performance of the mitigation on the ground. When a permit holder meets its mitigation obligations by purchasing mitigation bank credits, the liability for mitigation transfers from the permittee to the mitigation banker.[5]

In-lieu fee arrangements, in contrast, involve a transfer of liability for mitigation from the permit holder to an in-lieu fee provider, but without the establishment of actual mitigation in

---

[3] For a fuller description of mitigation systems, see Compensatory Mitigation for Losses of Aquatic Resources: Proposed Rule, 71 FED. REG. 15519 (Mar. 28, 2006) ("Proposed Mitigation Rule"). The Proposed Mitigation Rule was required by Congress. *See* 33 U.S.C. § 1344, notes.

[4] *See* Proposed Mitigation Rule, 71 FED. REG. at 15528-30; *see also* Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 FED. REG. 58605 (Nov. 28, 1995) ("MB Guidance") (reproduced at AR-0021900-09).

[5] Mitigation banking has been endorsed by scientists and by Congress as a highly appropriate form of mitigation. *See* Society of Wetlands Scientists, *Wetland Mitigation Banking* (Feb. 2004), *available at* http://www.sws.org/wetlandconcerns/banking.html. Congress established a preference for use of mitigation banks in the surface transportation laws. 23 U.S.C. §§ 103(b)(6)(M) & 133(b)(11) (2005).

advance of impacts.[6]  A fee is paid to a third party organization ("in-lieu fee provider") based on the representation (plans, prospectus) that the in-lieu fee provider will, in the future, implement actual mitigation.

In-lieu fee mitigation arrangements are allowed under limited circumstances and have been severely criticized.  There are obvious, inherent risks when the Corps excuses the permit holder from liability for mitigation where the in lieu fee provider has offered little more than a promise of future mitigation.  The Corps and the Environmental Protection Agency ("EPA") Proposed Mitigation Rule would eliminate use of in-lieu fee arrangements.[7]  In-lieu fees have been uniformly found lacking in reports of the Government Accountability Office ("GAO"),[8] the National Academy of Sciences ("NAS"),[9] and the Environmental Law Institute ("ELI"),[10] among others.

The Proposed Mitigation Rule addresses at length the serious deficiencies of in-lieu fee mitigation, including the following problems: "substantial time lag between permitted impacts and implementation of compensatory mitigation projects";  not having  "the same financial assurances as mitigation banks";  "greater uncertainty associated with in lieu fee programs regarding the final mitigation and its adequacy to compensate for lost functions and services;" "credits are sold before the details (or even the location) of a specific compensatory mitigation project have been determined";  because "market pressure of needing to provide a sufficient

---

[6] *See* Federal Guidance on the Use of In-Lieu Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, 65 FED. REG. 66913 (Nov. 7, 2000) ("In-Lieu Fee Guidance") (reproduced at AR-0021895-99).

[7] Proposed Mitigation Rule, 71 FED. REG. at 15530-31.

[8] GAO, *Wetlands Protection: Assessments Needed to Determine Effectiveness of In-Lieu-Fee Mitigation*, GAO-01-325 (May 4, 2001) ("GAO Report") (reproduced at AR-0021820-40).

[9] NAS, *Compensating for Wetland Losses Under the Clean Water Act* (2001) ("NAS Report") (reproduced at AR-0021916-2258).

[10] Environmental Law Institute, *Status and Character of In-Lieu Fee Mitigation in the United States* (2006), *available at* www.2eli.org ("ELI Study").

3

return to investors is missing, in-lieu fee sponsors may underestimate the credit price, and undercut a mitigation bank doing business in the same service area"; and, "it is difficult for the Corps to determine what an adequate price might be in the absence of definitive information about the location and type of mitigation project to be provided." Proposed Mitigation Rule, 71 FED. REG. at 15530.

The GAO Report concluded that the effectiveness of in-lieu fee mitigation is uncertain. Among other findings, GAO reported that EPA, the U.S. Fish and Wildlife Service ("FWS"), and others "questioned whether in-lieu-fees are being used in a timely manner and appropriately and whether adequate monitoring of mitigation efforts is taking place. These concerns are not unfounded." AR-0021831.

The NAS Report identified the many concerns and deficiencies of in-lieu fee mitigation. The reported noted that "[l]ag times [inherent in in-lieu fees] result in a temporal loss of wetland function, but more important, it increases the uncertainty that the compensation action will prove ecologically viable." AR-0022098.

The ELI Study reviewed all existing in-lieu fee arrangements as of 2005.[11] It identified 23 standards for measuring in-lieu fees, and found that in-lieu fee programs were meeting only 6 of the 23 standards. ELI Study at p. 63. Referring to the GAO Report and the NAS Report, "ELI's study finds that in the vast majority of cases, in-lieu fee mitigation is not being carried out in a manner that fully addresses the recommendations offered by existing studies and guidance." *Id.* at p. 65.

The OMP permit process started on the right track for mitigation in 2003 and 2004, with OMP researching many potential mitigation sites and developing specific mitigation options that

---

[11] The ELI Study does not include the OMP in-lieu fee, authorized in December 2005. *See generally,* ELI Study at pp. 1-152.

could have been in place prior to issuing the Section 404 permit. The OMP Section 404 permit application (November 2004) proposed specific mitigation sites with conceptual mitigation plans. During public review of the Federal Aviation Administration ("FAA") Draft Environmental Impact Statement ("Draft EIS") in Spring 2005, the public was shown maps and aerial photographs of the specific locations where offsite mitigation for the impacts to wetlands and streams at O'Hare would occur. The public was led to believe that the mitigation would occur at one of more of the actual sites presented.

In mid-or late 2005, however, the mitigation approach changed abruptly. Rather than requiring OMP to identify sites and develop mitigation plans, the Corps allowed and indeed encouraged OMP to utilize an in-lieu fee arrangement. Only after the FAA released its Final EIS did the Corps first advise the public that it would allow use of an in-lieu fee. Although comments from the public and from the EPA and FWS uniformly insisted that specific mitigation sites and plans were needed, the record reflects that the Corps was under considerable pressure from FAA and others to issue this permit. Utilizing the in-lieu fee approach enabled the Corps to meet externally imposed deadlines.

The OMP in-lieu fee arrangement is not consistent with law or policy, and the Corps' determination should be set aside by this Court.

## SUMMARY OF ARGUMENT

Under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*, which governs judicial review here, the Corps' permit decision should be set aside as arbitrary, capricious and not in accordance with law. The Corps failed to comply with the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA"). The OMP permit is an action with significant environmental impact, that required an EIS. The Corps prepared an

Environmental Assessment ("EA") and made an untenable finding under NEPA that this permit did not result in "significant" impacts.  The Corps did not properly rely upon the FAA EIS, as it failed to independently evaluate environmental impacts as required by NEPA.  The Corps failed to provide the public with accurate and complete information on the mitigation in the NEPA process.  It failed to evaluate alternatives, particularly for their impacts to wetlands and streams.

The Corps cannot issue a CWA permit authorizing destruction of wetlands and streams without requiring the applicant to satisfy the "practicable alternatives test" of 40 C.F.R. § 230.10(a).  For projects that do not need to be located at or near water ("non-water dependent projects"), these regulations prohibit permit issuance unless the applicant makes a clear showing that no alternatives exist.  *Id.* at § 230.10(a)(3).  The Corps failed to apply this critical standard to the OMP permit, and reached conclusions not supported by the record.

The Corps' authorization of an in-lieu fee arrangement to provide 280.14 acres of mitigation violates Corps regulations and policies governing mitigation.  The uncertain and unsupported mitigation approved by the Corps is unreasonable.  It was arbitrary and capricious for the Corps to deviate from its own guidance and standards for wetland mitigation.

## FACTS

OMP knew that mitigation for impacts to wetlands and other waters of the United States would be an essential part of its Section 404 permit.  Prior to 2003, the City of Chicago ("the City") contracted for an assessment of available offsite mitigation, resulting in a March 2003 report entitled "O'Hare Modernization Project: Wetland Mitigation Options."  SOF 13; AR-0023694-768.[12]  This report identified 12 mitigation banks with 408 credits available; 6 additional mitigation banks outside of the watershed with 177 credits available; 2 solitary sites

---

[12] Plaintiffs have included references to Plaintiffs' Statement of Facts and to the Administrative Record for ease of reference.

with potential of 329 credits available; and 19 "linked sites" with potential of 243 credits. SOF 13; *Id.* at AR-0023716-29. It also identified city sites with potential of 115.3 credits. SOF 13; *Id.* at AR-0023744;[13] *see also* AR-0022809-13 (notes of March 31, 2003 meeting regarding mitigation).

By September 2003, the City, the FAA and consultants had prepared a detailed Wetland Mitigation Conceptual Plan, with specific mitigation sites. At a meeting with the Corps and others on September 17, 2003, a 53 page PowerPoint presentation provided a detailed mitigation approach.[14] SOF 14; AR-0023094-146; *see also* AR-0023147-52 (meeting minutes).

The City and the agencies fully understood that actual mitigation would be required prior to permit issuance. For example, the presentation on September 17, 2003 provided a schedule that would have had the City select the mitigation sites first, and file its permit application thereafter. *See* SOF 15; AR-0023144. The meeting agenda identified the need for OMP to secure "wetland mitigation credits in advance of permit issuance." SOF 15; AR-0023567 (mitigation planning agenda, dated September 15, 2003).

Subsequently, in Spring 2004, the City issued a request for proposals to mitigation providers to provide specific mitigation projects, which generated 12 responses.[15] In June 2004, the City enacted an ordinance to assure that OMP had clear and sufficient authority to obtain the mitigation that would be needed to obtain the Section 404 permit. *See* AR-0024766-68.

---

[13] Other record documents, undated, reflect efforts to identify specific sites for mitigation. *See, e.g.,* SOF13; AR-0023568-71 (apparently prepared by a park or forest preserve district, identifying 8 sites in the Des Plaines watershed and 8 sites in the Fox River watershed).

[14] The presentation identified 12 mitigation banks with 408 credits, as well as DuPage County Forest Preserve District mitigation sites offering over 600 credits, and 7 city mitigation sites. SOF13; AR-0023122, AR-0023126 & AR-0023139. The City's consultant reported that "many potential sites are available" and named six offsite locations in the Des Plaines watershed: Butterfield Road, Delaney Road, Des Plaines River, Mink Creek, Towpath I & II, and Lily Cache. SOF 14: AR-0023121-23.

[15] A document "Wetland Credits – Request for Proposals, Qualified Sites" is referenced in a letter of February 2, 2005 from the Corps to the City. SOF 16; AR-0022666-67.

When the City filed its Section 404 permit application in November 2004, it used the information derived from the 2003 and 2004 mitigation site identifications.  The application includes 15 pages identifying potential sites, with details, as part of the mitigation plan.  *See* SOF 17; AR-0018963-77 (Permit Application, Sec. 4, Mitigation).

The permit applicant's proposed mitigation was explained in meetings held contemporaneously with the filing of the permit application.  *See* SOF 18; AR-0023547-75.  For a November 30, 2004 briefing with the Corps and other agencies, the City provided a proposed timetable with milestones, that clearly recognized that mitigation site selection and approval would have to pre-date permit issuance.  *See* SOF 18; AR-0023573 (identifying milestones).

The Permit application states the importance of having specific mitigation information available for the public:

> The selection process is anticipated to be completed within an appropriate timeframe to enable sharing of information related to each of the selected sites to interested participants at the joint public hearing coordinated with the FAA's Environmental Impact Statement. This approach is structured to take note of the need for public comments and concerns regarding environmental issues, such as wetlands and water quality, to be resolved concurrently.

AR-000018972 (emphasis added).

Other agencies, including EPA, emphasized that specific mitigation information was needed to process the permit application.

> I guess I am causing trouble for the Ohare [sic] people.  I sent them comments about a week ago telling them that EPA needed to see a description of all the mitigation sites, how the wetland restoration would be accomplished and what wetland types would be established. Apparently this is huge new news to these people.  I said that I would not consider the application complete enough to allow me to provide comments on compliance with the 404(b)(1) Guidelines with out this info and that EPA would likely object to the permit do to lack of info on the mitigation.
>
> ….

> So I think that there will be some discussion on the 30th regarding the timing of
> the 404 permit.

SOF 19; E-mail from Sue Elston, EPA, to Kathy Chernich, Corps, and Shawn Cirton, FWS,

(Nov. 22, 2004; 11:20 a.m.).

On January 21, 2005, the Corps issued a Supplemental Public Notice on the OMP Section

404 Permit application identifying six potential mitigation sites submitted by OMP, timed to

coincide with the FAA notice of public hearings on the FAA Draft EIS. *See* SOF 20; AR-

0020582-89. During the public hearings on the FAA DEIS, held on February 22nd, 23rd and 24,

2004, FAA provided information on the proposed mitigation that included a map/aerial

photograph identifying specific off-site mitigation sites. *See* SOF 21; AR-0021733-96, AR-

0021734, AR-0021780-81 (potential wetland mitigation sites).

By letter of February 2, 2005, the Corps advised OMP of its preliminary acceptance of

six of OMP's mitigation proposals and sites. *See* SOF 22; AR-0022666-71. At that time, the

Corps accepted Neal Marsh, Stockbridge, Heron Creek (2), Buffalo Creek, and Manhattan Creek

as potentially acceptable sites. SOF 22; *Id.* at AR-0022666-67. It also accepted the West Branch

site for impacts in DuPage County (69 acres). SOF 22; *Id.* at AR-0022667. In this letter, the

Corps rejected Lily Cache (because it will be a bank), Long View Meadow, Indian Creek,

Western Acres, Reed Turner Nature Preserve and Wilke Marsh. SOF 22; *Id.* at AR-0022667-68.

The Corps also recommended that the OMP revisit the sites developed in the 2003 reviews of

sites (noted above).[16] SOF 22; *Id.* at AR-0022668. In fact, the record reflects that the Corps had

retained Lily Cache as a potential site. *See* SOF 22; AR-0020699-700 (March 28, 2005 letter

from FWS).

---

[16] *See also* SOF16, E-mail from Mitchell Isoe, Corps, to Kathy Chernich, Corps (Jan. 12, 2005; 8:07
a.m.) ("I wonder if it might be worth mentioning a couple of the sites discussed last year with MWH
which didn't show up on their list as being excellent sites. I think noting our disappointment that they
seemed to drop from consideration might be a not too subtle suggestion.").

9

During March 2005, representatives of the Corps conducted site visits of the identified prospective mitigation sites.  Based on the site visits, the Corps apparently had concerns about certain sites.  Notes from site visits on March 14, 2005 indicate that Lily Cache and Neal Marsh were acceptable, Heron Creek could be acceptable, but Stockbridge was not acceptable.  *See* SOF 23; AR-0023074-75.

During this same period, the public and other federal agencies were commenting on the Corps' First Supplemental Public Notice and the FAA Draft EIS.  FWS commented that the applicant needed to provide "all pertinent site information such as site concepts, wetland delineations, areas proposed to be created, restored and/or enhanced, proposed mitigation ratios, etc." for review.  SOF 24; AR-0020700 (March 28, 2005 letter from FWS).  FWS offered to "work with the City of Chicago, FAA, the Corps of Engineers and others to develop a strategy for identifying additional mitigation sites that would fully compensate for impacts." SOF 24; *Id.* at AR-0020700-01.  EPA provided similar comments, stating: "In order to fully compensate for the impacts to wetlands and other WUS, the City needs to find additional mitigation sites.  The EPA is willing to continue to work with the City and the MRT to identify additional mitigation sites. . . . We request that a permit not be issued for this project until the mitigation issue has been resolved."  SOF 24; AR-0020702, AR-0020704 (April 4, 2004 letter from EPA).

By letter of April 6, 2005, the Corps advised the City that it was short of mitigation credits after the Corps narrowed the OMP's 12 mitigation sites to three.  SOF 25; AR-0022709-10.  The Corps  suggested that the City could use CorLands to assist in developing its mitigation.  SOF 25; *Id.* at AR-0022710.  The April 6, 2005 letter stated: "Our rationale for the final narrowing will be provided under separate correspondence." SOF 25; *Id.* at AR-0022709.  No such separate correspondence exists in the record.

As word leaked out that the Corps might allow OMP to use an in-lieu fee arrangement, rather than select actual mitigation sites, the Corps received letters cautioning against such an approach. SOF 26; AR-0022863-69 (July 8, 2005 letter from Wetlands Mitigation of Illinois). The record indicates that the Corps (and other federal agencies) wanted more information about specific sites, which was available, had the mitigation providers been contacted. SOF 27; AR-0020818-19 (October 10, 2005 letter from Applied Ecological Services); AR-0020822 (October 4, 2005 letter from Wetland Research, Inc.). [17]

What does appear in the record is increasing pressure on the Corps from FAA to meet a pre-determined deadline for permit issuance. FAA consistently emphasized the importance of its schedule to other agencies, including the Corps. The Corps was party to an Interagency Agreement with FAA for processing of each agency's decisions on OMP. SOF 31; AR-0020563-70.

From early in drafting of the FAA EIS, FAA firmly stated it would allow no delays or extensions. "Mike's [sic] expressed his best estimate that FAA's ability to offer approval to requests for comment period extensions following release of the forthcoming EIS is likely to be highly limited to nonexistent." SOF 42; E-mail from Michael MacMullen, FAA, with copy to Mitchell Isoe, Corps, *et al.* (June 25, 2004; 10:29 a.m.).

In Spring of 2005, when the Corps, EPA and FWS were advising OMP that it needed to do additional work and find additional mitigation sites, FAA intervened to keep the project on

---

[17] See also comment letters of September 16, 2005 and an October 11, 2005 from Wetlands Mitigation of Illinois ("WMI"), which were not included with the bates numbered documents in the Corps record. These letters appear as an email attachment in the record. *See* SOF 33; E-mail from Kathy Chernich, Corps, to Ted Woosley, Consultant, OMP (Nov. 1, 2005; 5:47 p.m.), *enclosing* WMI in-lieu fee letters (hereinafter "September 16, 2005 WMI in-lieu fee letter" and "October 11, 2005 WMI in-lieu fee letter," collectively "WMI in-lieu fee letters").

schedule. FAA wanted a resolution of the mitigation issues that would allow timely permit issuance.

> I think it is imperative that we think in terms of scheduling an FAA/City/MRT discussion as soon as reasonably feasible. . . . [W]e need to know [what is needed] … as satisfactory resolution of MRT's expressed mitigation concerns. <u>By the phrase "satisfactory resolution", I mean adequate to allow for potential permit issuance essentially concurrent with FAA's ROD approval, but probably prior to specification of the exact site(s) where the mitigation would actually be provided</u>.
>
> …
>
> If you have any questions concerning this communication, please contact me directly. Also, please contact me directly, and please ask the other members of the MRT to contact me directly, for any future concerns that might arise concerning the City's mitigation plans."

SOF 41; E-mail from Michael MacMullen, FAA, to Kathy Chernich, Corps, *et al.* (Apr. 15, 2005; 8:20 a.m.) (emphasis added).

> Similar messages continued through mid-2005:
>
> Things are starting to move quickly on the wetlands compensatory mitigation front. Therefore, I wanted to reach out to you to make sure that I have a good understanding of where you folks as members of the Mitigation Review Team are coming down on the subject of wetlands compensatory mitigation [in the 404 permit]. …
>
> The City met yesterday for preliminary discussion with CorLands folks. . . . <u>A key City goal is a permit issuance decision simultaneously with issuance of FAA's ROD.</u>"

SOF 40; E-mail from Michael MacMullen, FAA, to Sue Elston, EPA, *et al.* (May 3, 2005; 4:32 p.m.) (attached to May 4, 2005 e-mail) (emphasis added).

> [Send an email to Corps saying you want them to consider two additional sites] ASAP, please. …
>
> I think it would also be a good idea if you folks were to plan on sending an e-mail to Kathy (CC to me) on a weekly basis describing upcoming, ongoing, and/or completed wetland mitigation discussions and any other developments[.]

SOF 40; E-mail from Michael MacMullen, FAA, to Ted Woosley, Consultant, OMP, *et al.* (May 10, 2005; 2:37 p.m.).

> Any progress on determining the extent of potential use of Neal Marsh and/or Lilly [sic] Cache sites for mitigation credits? …
>
> Thanks very much for your on-going involvement in these matters. As always, if there is anything that you see as not getting done, or perhaps not getting done as per your expectations, let me know.

SOF 40; E-mail from Michael MacMullen, FAA, to Kathy Chernich, Corps, *et al.* (May 26, 2005; 7:58 a.m.).

> I received an e-mail for [sic] FAA requesting a meeting ASAP with the Corps, CorLands, and the MRT regarding O'Hare mitigation.

SOF 40; E-mail from Kathy Chernich, Corps, to Sue Elston, EPA, *et al.* (May 26, 2005; 12:45 p.m.).

> FAA was also calling the Corps about the schedule:
>
> [T]hanks for the update. Mike MacMullen called me this morning with a couple of questions. He wanted to know if we had gotten the contract from you yet and if there was word when you would provide us with a prospectus?
>
> I told him that it was my understanding the City was holding up the agreement for various reasons. He volunteered to encourage them to bring it to closure.

SOF 43; E-mail from Mitchell Isoe, Corps, to Joe Roth, CorLands (Aug. 2, 2005; 12:13 p.m.).

> The same interest in speed was reported by others. For example, Joe Roth from CorLands emphasized the pressing schedule when advised the Corps and others that the City wanted CorLands to take on additional work:
>
> I just talked with Ted Woosley and he indicated that the City will be requesting that the acreage Corlands agree to take on under the proposed OMP contract with the City be increased to approximately 280 acres. This increase adds on acreage proposed for impact in Du Page County and <u>I think reflects the City's belief that they cannot reach an agreement with the FPD of Du Page County within the time frame necessary to attempt to secure the 404 permit. Ted reiterated that the City's #1 priority is to secure the 404 permit.</u>

SOF 44; E-mail from Joe Roth, CorLands, to Mitchell Isoe, Corps, *et al.* (Aug. 3, 2005; 5:25

p.m.) (emphasis added).  FAA continued to urge the Corps to act promptly on the Section 404

permit.

> Meanwhile the clock ticks on.  I call City folks every day to get an update, and I
> shall continue to do so. If and when the prospectus is found acceptable, would it
> be possible to release the Notice at that time?  Again, I'm concerned for the march
> of time here.

SOF 45; E-mail Michael MacMullen, FAA, to Mitchell Isoe, Corps, *et al.* (Aug. 16, 2005; 2:07

p.m.).

In August, FAA received an email from the city's consultant indicating that the Corps felt

it had until October to process the permit.  This information prompted a blistering message from

FAA to the Corps regarding the timing for permit issuance:

> I presume this is something of a minor misunderstanding?
>
> In my mind, I have been as consistent as I know how to be on this matter. For
> over the past year we have been saying that FAA's schedule calls for issuance of
> the ROD in September of 2005.  Since the CorLands /City contract has now been
> signed (I'm told), I presume CorLands will be providing you folks with an
> approvable prospectus momentarily (if it hasn't already done so). Thereafter, you
> will provide us (we'll need to get it to Matt Demos of CMT) the clean (copy-
> ready) Public Notice. CMT will copy and mail the Notice.  If everything goes as
> planned, and giving all due consideration to comments received on the Notice, I
> would assume that the Corps would then be in position to make a permit decision
> ASAP thereafter. Recognizing all the foregoing, as I see it, the programmatic goal
> remains to make a permit decision as soon as possible following completion of
> FAA's ROD.

SOF 46; Email from Michael MacMullen, FAA, to Kathy Chernich, Corps, *et al.* (Aug. 30, 2005;

7:36 a.m.) (emphasis added).

When the EPA continued to insist on having sufficient information to assure appropriate

mitigation, FAA again emphasized the importance of meeting the schedule. "A second concern

relates to timing matters.  I'm not sure the requested information will all be available in time to

meet the Corps' hoped-for schedule for a permit issuance decision. Again, if it can be made available on a timely basis, fine." SOF 47; Email from Michael MacMullen, FAA, to Mitchell Isoe, Corps, *et al.* (Nov. 3, 2005; 9:38 a.m.).

The FAA released its Final Environmental Impact Statement ("FEIS") on July 27, 2005. SOF 32; AR-0021224-31. FAA issued a Record of Decision ("ROD") approving the Project on September 29, 2005. *See* SOF 32; AR-0020602 (noting issuance of ROD).

On September 12, 2005, the Corps issued a Second Supplemental Public Notice in which the Corps first provided the public with information on the change in mitigation from actual site selection to an in-lieu fee arrangement. SOF 33; AR-0020590-95. The notice generated 18 comments, of which 15 were highly critical of the in lieu fee proposal. SOF 33; AR-0020773-826 (54 pages of comments).[18] The Sierra Club expressed shock at the shift to an in-lieu fee:

> We were surprised and dismayed at the recent zigzag taken by the Corps and the O'Hare Modernization Mitigation Review Team (MRT) regarding the 153 acres of destroyed wetlands planned for the airport expansion. Over 14 months ago, the process was started to select new wetlands in the area to compensate for the large amount bulldozed for the airport. At that time, and at almost every checkpoint between that time and now, we had expected—and, in fact, formally commented on—the selection process to end with a clear definition of new wetlands and a schedule to complete those wetlands in advance of the O'Hare wetland impacts.
>
> We are not sure what went on behind the scenes that lead [sic] to this flawed solution. Whatever the reasons, this solution to compensate for the Chicago District's largest wetland loss in recent memory will lead to a significant loss of wetlands in our area.

SOF 34; AR-0020798. Both the FWS and the EPA also expressed concerns that the in-lieu fee mitigation lacked sufficient details and security to assure that mitigation would occur. SOF 35;

---

[18] Letters critical of the in-lieu fee include those at: AR-0020787-88 (Congressman Paul Ryan and Congresswoman Melissa Bean); AR-0020795-97 (Hey and Associates, Inc.); AR-0020798-800 (Sierra Club); AR-0020801-02 (Environmental Banc & Exchange); AR-0020803-06 (FWS); AR-0020807-09 (EPA); AR-0020810 (Long Grove Park District); AR-0021811 (same); AR-0021812 (same); AR-0021820-21 (same); AR-0020813-17 (NMBA); AR-002818-19 (Applied Ecological Services); AR-0020822-23 (Wetland Research, Inc.); SOF 33. *See also* September 16, 2005 WMI in-lieu fee letter and October 11, 2005 WMI in-lieu fee letter.

AR-0020803, AR-0020804 (FWS noted that "[i]t is unfortunate that a project of this size and amount of lead time has been unable to identify mitigation sites in advance of Section 404 permit issuance."); AR-0020807, AR-0020808 (EPA noted that "[w]e have several concerns with this process.").

The record reflects that the Corps could have required OMP to perform mitigation at specific mitigation sites. For example, Neal Marsh was identified as an acceptable site in the Corps' February 2005 letter, SOF 27; AR-0022666-71, and in its March 2005 site visit notes, SOF 27; AR-0023074-75, as well as in March 2005 letters from both the FWS and EPA. SOF 27; AR-0020699-701; AR-0020702-04. Yet the Corps rejected Neal Marsh in April. SOF 27; AR-0022709-10. However, in June, the Corps also indicated that Neal Marsh was likely an acceptable site, had the Corps taken the time to review it:

> Neal Marsh was removed from the list because the revisions to the project have not been reviewed by the IEPA or by the Corps. The file would need to be reopened for review and meetings would need to be held just to get all parties on board again. Even if the project is approved, we don't anticipate this process being completed by the fall of this year. There is a possibility though, for the project to be considered for mitigation opportunity with CorLands.

SOF 29; E-mail from Kathy Chernich, Corps, to Ted Woosley, Consultant, OMP, *et al.* (May 26, 2005; 1:12 p.m.). The Corps was informed of other potential sites, including Cedar Creek. *See* SOF 30; AR-002863-69 (July 8, 2005 letter from WMI); *see also* WMI in-lieu fee letters. FWS asked about use of Cedar Creek for OMP impacts in October 2005. SOF 30; E-mail from Jeffrey Mengler, FWS, to Jon Abrant, Corps (Oct. 24, 2005; 12:27 p.m.) (attached to November 2, 2005 e-mail from Corps to FWS). Other comments in 2005 reminded the Corps that specific sites were available and should have been selected. SOF 30; AR-0020818-19 (October 10, 2005 letter from Applied Ecological Services); AR-0020822-23 (October 4, 2005 letter from Wetland Research, Inc.).

Headquarters of the Corps, which was drafting the Proposed Mitigation Rule during 2005, advised the Chicago Corps District that use of an in-lieu fee for OMP impacts was unusual.  SOF 36; *See, e.g.,* E-mail from Mitchell Isoe, Corps, to Col. Gary Johnston, Corps (Sept. 23, 2005; 5:06 p.m.)  ("HQ is concerned because it is the first time something like this has been done."); E-mail from Katherine Trott, Corps HQ, to Mitchell Isoe, Corps, *et al.* (Sept. 15, 2005; 11:54 a.m. ("We have a concern regarding the amount of money and mitigation requirements that this agreement would be providing.").

Despite the comments, on December 19, 2005, the Corps issued permit 200301000 authorizing OMP to pay a flat fee of $26,466,429.00 to CorLands as an in-lieu fee provider responsible for 280.14 acres of off-site mitigation.  SOF 2; AR-0020675-86 (DA Permit).  The permit also authorizes purchase of 62.26 acres of mitigation credits from Lily Cache Wetland Mitigation Bank ($4,544,980.00).  SOF 2; *Id.* at AR-0020677.  The Corps prepared a Permit Evaluation and Decision Document, which contained an Environmental Assessment ("EA") and finding of no significant impact ("FONSI") pursuant to NEPA.  SOF 3; AR-0020601-32 (ROD and EA).

After issuance of the permit, the Corps also made available to the public additional documents concerning establishment and administration of the in-lieu fee.  These include an Interagency Coordinating Agreement ("ICA") establishing procedures to govern the O'Hare Modernization Mitigation Account ("OMMA"), dated December 2005.  SOF 48; AR-0020633-74.  The ICA establishes a Mitigation Review Team ("MRT"), consisting of the Corps, FAA, FWS, EPA and Illinois EPA ("IEPA"), to provide oversight of the in-lieu fee arrangement.  SOF 49; *Id.* at AR-0020636.  Appendix A to the ICA is an August 26, 2005 Agreement between CorLands and the City of Chicago.  SOF 49; *Id.* at AR-0020643-57.  Appendix B to the ICA is

"an initial Prospectus" prepared by CorLands and submitted to the Corps, dated August 31, 2005. SOF 49; *Id.* at AR-002058-67.

The August 2005 Agreement between the City and CorLands transfers all liability for obtaining the 280.14 acres of mitigation from the City to CorLands. SOF 50; AR-0020640. Neither the City nor OMP are signatories to the ICA. *See* SOF 50; AR-0020644-57. The ICA erroneously recites that the CorLands Prospectus "was the subject of a public notice dated September 6, 2005." SOF 51; AR-0020636. Neither the ICA nor any of its appendices were subject to public notice or an opportunity for comment.

Under the permit, the ICA, and the Agreement between the City and CorLands, CorLands has not identified a single, actual mitigation site or proposal. Nonetheless, CorLands obtained significant, immediate financial benefits which are not applied to actual wetland mitigation. CorLands received a non-refundable administrative fee of $518,950.00. SOF 52; AR-0020645-46. The $25,947,479.00 fee for mitigation is held by CorLands, rather than an independent, bonded escrow agent. SOF 52; AR-0020646. CorLands retains interest on the $25,947,479.00 fee and need not use this interest to obtain wetland mitigation. SOF 52; *Id.*

The 62.26 acres of mitigation credits provided by the Lily Cache Mitigation Bank provides a sharp contrast to the uncertain in-lieu fee arrangement for 280.14 credits. The Lily Cache Mitigation bank had a known, secured site, with a mitigation banking instrument that included an approved mitigation site, financial assurances, performance standards and other criteria. The $4,544,980.00 fee for these 62.26 credits is being held by the North Cook County Soil Water Conservation District, with payments to Lily Cache phased to relate to performance of actual mitigation. AR-0020677.

Plaintiffs made efforts, prior to filing of this lawsuit, to address their concerns with the

Corps.

## GOVERNING LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c). The moving party must carry the initial burden of proof by identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Scaife v. Cook Cty,* 446 F.3d 735, 739 (7th Cir. 2006).

The Administrative Procedure Act ("APA") mandates that final agency action, such as the Corps permit decision here, shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A) & (D) . The term "arbitrary and capricious" is a "technical legal phrase," meaning "an administrative action not supported by evidence or lacking a rational basis." *Nor-Am Agric. Prods., Inc. v. Hardin,* 435 F.2d 1133, 1145 (7th Cir. 1970), *rev'd en banc on other grounds*, 435 F.2d 1151 (1970). "[A] court must be persuaded by concrete evidence, readily available to [the agency] during its decision-making process, that [demonstrates] the ... [agency] relied on a materially distorted picture[,]" when making its decision. *Alschuler v. Dep't of Housing and Urban Develop.*, 686 F.2d 472, 485 (7th Cir. 1982). An agency decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  When reviewing agency actions pursuant to NEPA, "the arbitrary and capricious standard that ordinarily governs review of administrative matters … is controlling."  *See Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225, 229-30 (7th Cir. 1975).

NEPA, 42 U.S.C. § 4321 *et. seq.*, requires that the Corps prepare an Environmental Impact Statement ("EIS") for any major federal action that may have a significant impact on the environment.  An EIS must consider all reasonable alternatives to the proposed action, discuss the direct and indirect environmental impacts of the proposed action, and discuss and evaluate the effectiveness of mitigation measures that could avoid or minimize such impacts.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.2, 1502.14, 1502.16, 1508.20; *see also Simmons v. Corps,* 120 F.3d 664, 670 (7th Cir. 1997) (holding that "[i]f NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives.  In this case … the Corps never looked at an entire category of reasonable alternatives and thereby ruined its environmental impact statement.").

The CWA, 33 U.S.C. § 1251 *et. seq.*, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Dredged or fill materials are pollutants under the CWA.  *Id.* at § 1362(6).  Section 404 of the CWA, authorizes the Corps to issue permits to discharge or place "dredged or fill materials" into waters of the United States, including wetlands.  *Id.* at § 1344.  Corps regulations specifically target wetlands as a "productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b).

All wetlands are special aquatic sites under federal regulations, warranting special protection.  40 C.F.R. §§ 230.3(q-1) and 230.41.  The Corps cannot issue a wetlands permit without finding that there are no practicable alternatives to the proposed wetland impacts.  *Id.* at

§ 230.10(a). For an activity like the OMP, which is not water dependent, practicable alternatives are presumed to exist, and the applicant must make a clear demonstration to overcome the presumption. *Id.* at § 230.10(a)(3).

Mitigation is required for impacts permitted under Section 404. *Id.* at §§ 230.70-77; 33 C.F.R. § 320.4(r). If the permit applicant establishes that no less damaging, practicable alternative is available to avoid the filling of wetlands, the applicant must then show that all appropriate and practicable steps will be taken to minimize adverse impacts of the discharge on wetlands. *See* 40 C.F.R. § 230.10(d).

The Corps selects mitigation requirements for permits, following standards in its own regulations and guidance. Mitigation criteria are set out in, among other sources, the MB Guidance, AR-0021900-09, and the ILF Guidance, AR-0021895-99. The MB Guidance and the ILF Guidance provide a preference for the use of mitigation banks rather than in-lieu fee arrangements, and require use of mitigation banks where mitigation banks and in-lieu-fees arrangements have overlapping service areas. AR-0021897 (ILF Guidance, Sec. III.B.2.). When an in-lieu fee is used in relation to an individual permit, it must be approved as a mitigation bank. AR-0021897 (ILF Guidance, Sec. III.A.).

In 2002, the Corps issued Regulatory Guidance Letter 02-02, Guidance on Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps Regulatory Program Pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899 (Dec. 24, 2002) ("RGL 02-02"). AR-0022259-74. RGL 02-02 provides additional Corps guidance and policy for the type, timing, and location of, and financial assurances and performance standards for, mitigation.

In March 2006 the Corps and EPA published a Proposed Mitigation Rule, establishing

21

standards to govern mitigation for Section 404 permits.  The agencies have proposed that in-lieu fee arrangements "would cease to exist as a separate mechanism for providing compensatory mitigation." Proposed Mitigation Rule, 71 FED. REG. at 15530.  The Proposed Mitigation Rule provides an interpretation of the requirements of the CWA.  *Id.* at 15534-45.

The Corps Chicago District also has published guidelines for mitigation and a standard Interagency Coordination Agreement that establish standards to govern mitigation authorized in permits issued in this District.  Corps of Engineers, *Chicago District 2004 Mitigation Requirements* (2004) (reproduced at AR-0021797-819); Corps Of Engineers, *Interagency Coordination Agreement On Wetland Mitigation Banking Within The Regulatory Boundaries Of Chicago District* (Jan. 1997), *available at* http://www.lrc.usace.army.mil/co%2Dr/ica_all.htm. Neither the Chicago District 2004 Mitigation Requirements nor the standard Interagency Coordination Agreement allow, or even mention, the use of in-lieu-fee mitigation as acceptable means to mitigate for wetland losses in the Chicago District of the Army Corps of Engineers.

## ARGUMENT

### I.    THE CORPS FAILED TO COMPLY WITH NEPA

The Corps' record is inconsistent and inadequate in describing how it complied with NEPA.[19]  Approval of the OMP is a major federal action significantly effecting the environment that requires an EIS.  However, the Corps expressly relied upon an EA and FONSI in its ROD. *See* AR-0020628.  While the Corps might have been able to rely upon the FAA EIS, on this

---

[19] *See Windsor v. United States,* 419 U.S. 938, 940-41 (1974) ("It is a 'simple but fundamental rule of administrative law . . . [that if] the administrative action is to be tested by the basis on which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action.'"), *citing*, *SEC v. Chenery Corp*., 332 U.S. 194, 196-97 (1947);  *see also Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) ("the Corps' conclusions must find some reasonable support in the record.").

record it failed to do so. Moreover, both the Corps EA and the FAA EIS are inadequate with respect to public disclosure of mitigation and with respect to analysis of alternatives.

A.    THE CORPS' ENVIRONMENTAL ASSESSMENT IS INADEQUATE

An EA is a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare a more extensive EIS or a finding of no significant impact. 40 C.F.R. § 1508.9(a)(1); *Van Abbema*, 807 F.2d at 636. The Council on Environmental Quality ("CEQ") regulations state that, in determining whether to prepare an environmental assessment or an environmental impact statement, the agency should choose an EIS if the action "normally requires an EIS." 40 C.F.R. § 1501.4(a)(1).[20] Clearly, the major wetlands and other environmental impacts of the OMP make it an action that "normally requires an EIS."

Thus the Corps' reliance on an EA was unlawful. In the EA, the Corps reaches the untenable conclusion that destruction of 97.1 acres of wetlands and streams will not have a significant environmental effect. This is patently arbitrary and not supported by the record. The Corps EA correctly identifies substrate (earth) impacts as "Significant," quoting directly from the FAA EIS. AR-0020620 (ROD). However, the Corps checks the box "No appreciable effect on any special aquatic sites," simultaneously noting that "154 acres of wetlands will be directly effected." *Id.* at AR-0020622. <u>All</u> wetlands are "special aquatic sites." 40 C.F.R. §§ 230.3(q-1) & 230.41. The Corps offers no explanation – nor could it – of how destruction of 154 acres of wetlands and streams could support a conclusion of "no appreciable effect" on special aquatic sites.

The Corps also failed to meet the procedural requirements for an EA and FONSI. A FONSI must include a summary of the EA and note any other environmental documents related to it. *Id.*

---

[20] *See also* 33 C.F.R. § 325, App. B. *But see id.* at Sec. 7.

at §1501.7(a)(5). The Corps provides no such analysis. Moreover, if an agency elects to utilize an EA rather than an EIS, it should provide 30 days public notice and comment, if the action is one that would normally require an EIS. *Id.* at §1501.4(e)(2). The Corps did not provide 30 days public notice and opportunity for comment on its EA. To the extent that the Corps relied upon its EA to comply with NEPA, it violated the law.

> B.      THE CORPS DID NOT INDEPENDENTLY ASSESS ENVIRONMENTAL IMPACTS
>
> > 1.      The Record Does Not Demonstrate That The Corps Adopted The FAA Final EIS

An agency may adopt another agency's EIS or prepare an EIS jointly with another agency. The Corps was not a joint preparer of the FAA EIS.[21] The record reflects that the Corps entered into a "cooperating agency" agreement with FAA, AR-0020563-70, and acknowledged that an EIS was required.[22] The Corps may have been on the path to adopting the FAA EIS, but it veered off course.

What the Corps actually did was to adopt selected parts of the FAA EIS, rather than rely on the FAA EIS to satisfy its NEPA duties. The Corps' ROD states only that the Corps agreed to "adopt and incorporate" the FAA Final EIS into its "decision making process with respect to key issues such as the 404(b)(1) Guidelines, purpose and need, alternatives analysis, public interest review factors."[23] SOF 60; *See* AR-0020602 (emphasis added). The Corps does not state that it relied upon the FAA Final EIS to satisfy the Corps' independent duty to comply with NEPA. And, in fact, it relied on its own EA.

---

[21] The FAA EIS does not include the Corps as a preparer or reviewer. *See* AR-0010503-05 ("FAA is responsible for the preparation and content of this document.")

[22] *See, e.g.*, AR-0020585 (First Supplemental Public Notice); AR-0020594 (Second Supplemental Public Notice).

[23] *See also* AR-0022672, AR-0022673 (Corps' comment letter on FAA Draft EIS; stating that the Corps will use the FAA EIS for certain, limited purposes.).

2.      The Corps Failed To Independently Assess The FAA Final EIS

To the extent that the Corps intended to adopt the FAA Final EIS, it did not undertake the analysis required.  When the Corps is a cooperating agency, it must insure that lead agency's EIS is sufficient to be adopted by the Corps for purposes of exercising its regulatory authority.[24]  The essential NEPA duty is that every agency makes its own evaluation of the environmental impacts.  40 C.F.R. § 1506.5; s*ee Sierra Club v. Corps*, 295 F.3d 1209, 1223 (11th Cir. 2002) ("[i]f the Corps undertook no independent consideration of the appropriate scope of the [area affected by the project], it would be in violation of both NEPA and its own regulations."); *see also Anacostia Watershed v. Babbitt*, 871 F. Supp. 457, 485-86 (D.C. Cir. 1994) (failure to independently assess another agency's NEPA document was reversible error.)

Here, the record has scant evidence that the Corps undertook an independent review of the FAA EIS.  The Corps provided two letters to FAA.  SOF 61; *See* AR-0022676 (March 19, 2004 letter, agreeing to purpose and need statement); AR-0022672 (February 25, 2005 letter, commenting on DEIS).[25]  These letters do not indicate that the Corps performed its own, independent analysis of the full range of environmental impacts of the OMP permit.  Rather, the letters accord with what the Corps said it would do – use the FAA EIS for certain limited, specific information.

C.      NEITHER THE FAA EIS NOR THE CORPS EA ARE ADEQUATE UNDER NEPA

---

[24] *See* 40 C.F.R. § 1506.3; 33 C.F.R. § 325, App. B, Sec. 8.c; *see also* 33 C.F.R. § 230.21.

[25] For example, the Corps did not review all of the public comments on the FAA Draft EIS.  The record reflects that FAA sent the Corps only those comments on the Draft EIS that related to the Section 404 permit.  SOF 62; *See* E-mail from Michael MacMullen, FAA, to Mitchell Isoe, Corps, *et al.* (Apr. 8, 2005; 4:57 p.m.).

Whether reviewed by looking at the Corps EA or the FAA EIS, the NEPA record here is incomplete and inaccurate with respect to mitigation and with respect to the impacts of alternatives on wetlands and streams.

1.      The Corps Failed To Provide Sufficient And Accurate Information On Mitigation Under NEPA

NEPA has "twin functions" -- preparation of the EIS forces agencies to take a hard look at the consequences of the proposed action, and the distribution of the EIS "provid[es] important information to other groups and individuals." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989). NEPA "binds federal officials to justify their plans in public, after a full airing of alternatives." *Simmons*, 120 F.3d at 666. "Meaningful public participation is a vital part of NEPA." *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273, 1342 (S.D. Fl. 2006).

The Corps deprived the public of its right to meaningful participation in the NEPA process. The mitigation proposals provided throughout the FAA EIS process were not adopted by the Corps. The in-lieu fee arrangement that the Corps ultimately authorized first saw the light of day after close of comment on the FAA Final EIS. Under NEPA, the Corps failed to provide any public notice of the significantly changed mitigation that it actually authorized.

While an EIS may need not contain a "final" mitigation plan, "[m]itigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *City of Carmel-by-the-Sea v. DOT*, 123 F.3d 1142, 1154 (9th Cir. 1997), *citing*, *Robertson*, 490 U.S. at 353. Accurate information on mitigation is necessary because "implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson*, 490 U.S. at

26

351-52 (citation omitted); *see also Friends of the Earth v. Hall,* 693 F. Supp. 904 (W.D. Wash.

1988). The CEQ regulations direct that mitigation measures be discussed in an EIS. *See* 40

C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c) & 1508.25(b)(3).

A "proposed mitigation plan[] go[es] to the very heart of the question before the Corps in

preparing its environmental impact statement – whether the project should proceed at the present

time in view of its environmental consequences." *Envtl Defense Fund v. Froehlke*, 473 F.2d 346,

351 (8th Cir. 1972) (footnote omitted). Overturning a Corps permit, the court in *Flowers*

described the appropriate approach to mitigation analysis, stating that:

> The Corps' EIS identified various serious impacts, as noted above, and thus the
> Corps was required, by NEPA, to first attempt to avoid these impacts and then to
> minimize whatever was unavoidable, and, finally, to mitigate for any unavoidable
> adverse effect. Implicit in NEPA's demand that an agency prepare a detailed
> statement on 'any adverse environmental effects which cannot be avoided should
> the proposal be implemented,' is an understanding that the EIS will discuss the
> extent to which adverse effects can be avoided. More generally, omission of a
> reasonably complete discussion of possible mitigation measures would undermine
> the 'action-forcing' function of NEPA. *Robertson v. Methow Valley Citizens
> Council,* 490 U.S. 332, 351-52, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

423 F. Supp. 2d at 1321 (footnote omitted).

For the OMP, the public was actually misled about the mitigation under NEPA. The

public NEPA process – FAA's Draft and Final EISs – presented one approach to mitigation,

identifying specific potential mitigation sites. *See* Facts Section, *supra*; *see e.g.,* AR-0020582-

89; AR-0021734; AR-0021780-81; AR-0022666-67; AR-0021224-31. The Corps then selected

a completely different mitigation system, the in-lieu fee arrangement. The Corps' September

2005 Second Supplemental Public Notice, identifying the shift in mitigation to use of an in-lieu

fee arrangement, does not cure the NEPA error. *See* AR-0020590-95. "Because public

disclosure is a central purpose of NEPA, an EIS that does not include all that is required by

NEPA may not be cured by memoranda or reports that are included in the administrative record

27

but are not incorporated into the EIS itself." *Sierra Club v. Marsh,* 976 F.2d 763, 770 (1st Cir.

1992).

> Failure to accurately address mitigation under NEPA is reversible error:
>
> The record before the Court suggests that the Corps did not comply with NEPA in preparing the EIS, nor in issuing the permits. While the reduction in terms of the permits did retroactively render the EIS discussion of mitigation more adequate, it is nevertheless the case that the Corps should have rigorously evaluated, with public participation, the actual mitigation plan to be adopted with the permits. The location of the additional property to be mitigated, beyond the Pennsuco, is unclear from the EIS, or even the ROD -- as it appears that there may be insufficient land in the Pennsuco to accommodate even the 5,409 acres of mining to be conducted as a result of these "ten year" permits (13,522.5 acres would be needed). Having failed to identify, even generally, what other properties would be mitigated, the Corps violated NEPA by failing to provide the public with "sufficient information to . . . generate meaningful comment." 33 C.F.R. § 325.3(a) .

423 F. Supp. 2d at 1329 (emphasis added). As in *Flowers,* in this case, under NEPA, the public

had a right to know the actual contours of the mitigation approach adopted by the Corps.

>  2.  Neither The FAA EIS Nor The Corps EA Address Adequate Alternatives
>    Regarding Impacts To Wetlands

"NEPA requires that agencies 'study, develop, and describe appropriate alternatives' to

major federal projects." *Highway J Citizens' Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003)

(citation omitted). There must be "a searching inquiry into alternatives[.]" *Simmons*, 120 F.3d at

666. "[T]he evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative

means to accomplish the *general* goal of an action; it is not an evaluation of the alternative

means by which a particular applicant can reach his goals." *Van Abbema*, 807 F.2d at 638. The

alternative analysis, forms "the heart of the environmental impact statement." 40 C.F.R. §

1502.14; *Simmons*, 120 F.3d at 666.

28

The FAA EIS and the Corps EA eliminated from detailed environmental analysis all alternatives that did not involve maximum construction of new runways at O'Hare ("on-site alternatives."). SOF 63; AR-0010615-32. Although use of other airports was described, see AR-0010634-48, FAA screened out and dismissed all alternatives which would construct runways elsewhere or combine less expansion of O'Hare with use of other airports ("off-site or combined alternatives."). SOF 63; AR-0010616-21 (FEIS).

Plaintiffs recognize that FAA has been given substantial latitude and deference by reviewing courts in deciding whether off-site alternatives to airport expansion are "reasonable alternatives" under NEPA.[26] In 2003, Congress directed that cooperating agencies, such as the Corps, are to use FAA's choice of alternatives under NEPA in performing their independent NEPA duties.[27] However, the statutory direction that the Corps utilize FAA's NEPA alternatives does not vitiate the Corps duty to assure the FAA NEPA information is sufficient for its purposes.[28]

The FAA EIS record is barren of information about whether impacts to wetlands or streams could have been avoided or minimized by any off-site or combined alternatives. The

---

[26] *See, e.g., Suburban O'Hare Commission v. Dole*, 787 F.2d 186, 196-97 (7th Cir. 1986) (upholding FAA's rejection of alternatives involving using other airports or constructing a new airport); *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 432 (10th Cir. 1996) (FAA limited the detailed analysis of alternatives to the existing airport and, further, to certain locations at the airport); *see also City of Bridgeton v. FAA*, 212 F.3d 448, 455-459 (8th Cir. 2000) (upholding FAA's decision to undertake a screening process which resulted in the dismissal of all but a few on-site alternatives from detailed analysis); *Alliance for Legal Action v. Corps*, 314 F. Supp. 2d 534 (M.D. NC 2004) (upholding FAA and Corps decisions that off-site alternatives were not reasonable).

[27] The 2003 Aviation Act provide, in part that "[a]ny other Federal agency. . . that is participating in a coordinated review process under this section with respect to the project shall consider only those alternatives to the project that the Secretary [of Transportation] has determined are reasonable." 49 U.S.C. § 47171(k). This provision applies to selection of alternatives under NEPA. This law does not immunize the Corps from judicial review into whether there was sufficient environmental information about alternatives in its NEPA analysis.

[28] When relying upon an FAA EIS, the Corps has been held to the standard of conducting an independent analysis of alternatives to satisfy its independent NEPA duties. *See Airport Communities Coalition v. Graves*, 230 F. Supp. 2d 1207, 1222 (W.D. Wash. 2003) ("The record reflects, however, that the Corps did consider these alternatives. . .").

Corps' EA adopts the FAA alternatives analysis. This record fails to demonstrate that the Corps conducted a thorough evaluation of the wetland impacts of alternatives under NEPA.

II.     THE CORPS FAILED TO COMPLY WITH THE CWA

A.      THE CORPS FAILED TO CONSIDER ALTERNATIVES AS REQUIRED UNDER THE CWA AND ITS REGULATIONS

Independent of its duty to address alternatives under NEPA, the Corps has a strict, substantive mandate under Section 404 to select the least damaging practicable alternative. The regulations provide, in pertinent part, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). These regulations further provide strict standards for the permit applicant:

> Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not ''water dependent''), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

*Id.* at § 230.10(a)(3). The OMP is not a "water dependent" project. As such, the Corps had to require the permit applicant to "clearly demonstrate" that no practicable alternatives not involving special aquatic sites were available.[29]

---

[29] The burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant, not with the Corps. *Utahns for Better Transportation v. DOT,* 305 F.3d 1152, 1163 (10th Cir. 2002); *Reichelt v. Corps,* 923 F. Supp. 1090, 1094 (N.D. Ind. 1996).

"The Corps' burden in finding the least damaging practicable alternative under the CWA guidelines is heaviest for non-water dependent projects planned for a 'special aquatic site,' such as a wetlands area." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004). This is because "[t]he statute and regulations place a strong preference for wetland protection. 'It would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so.'" *National Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (citation omitted); s*ee also Utahns for Better Transportation,* 305 F.3d at 1186.

Here, the Corps failed to undertake the more exacting alternatives analysis required under the CWA. The Corps' ROD provides brief, conclusory statements that there are no practicable alternatives. AR-0020616-18. The ROD cites, verbatim, the FAA's NEPA alternatives analysis. *Id.* There is no indication in the record that the Corps required OMP to "clearly demonstrate" that no practicable alternatives existed.

OMP anticipated having to meet the "practicable alternatives" burden. Section 5.1.1. of the permit application says, in part, "[t]he Draft EIS for improvements to O'Hare International Airport will evaluate these alternatives [all on site and off site alternatives] and their impact on environmental resources such as wetlands and 'waters of the U.S.'" AR-0018979-80. However, the FAA EIS alternatives analysis, on which the Corps relied, failed to provide environmental information, such as wetland and stream impacts, for any alternative other than on-site expansion of O'Hare.[30] *See generally,* AR-0010615-31.

---

[30] Where courts have upheld the Corps' reliance on FAA information about alternatives to airport expansion, the reviewing court has been able to conclude that the Corps record demonstrates that it complied with its CWA duties. *See, e.g.*, *Graves,* 280 F. Supp. 2d at 1221-22; *Alliance for Legal Action*, 314 F. Supp. 2d at 555. This record lacks information for the Court to make any similar finding.

Potential alternatives with less wetland impacts could include use of regional or other mid-continent airports or the blended alternative which included some improvements at O'Hare and use of other, non-O'Hare projects. AR-0010654-56.[31] FAA stated that the "blended alternative" "is estimated to have the potential to substantially meet the purpose and need." SOF 65; AR-0010656. FAA subjected this alternative to secondary screening, which was intended to address the CWA practicable alternatives test. SOF 65; AR-0010657-58. Secondary screening looked at cost and some feasibility factors, but provided little environmental information. SOF 65; AR-0010663-64. FAA concluded that the blended alternative would meet purpose and need and would "cost less than all of the alternatives considered in secondary screening" (other than no-action), AR-0010663, but rejected it as not reasonable. SOF 65; AR-0010664.[32]

Whether FAA's conclusion about any off-site or blended alternatives was sufficient for its NEPA purposes, the record does not provide information on which the <u>Corps</u> could decide that such alternatives were not practicable under CWA regulations.[33] Under 40 C.F.R. § 230.10(a)(2):

> An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently

---

[31] Comments on the FAA draft EIS raised concerns with the extent of analysis of off-site alternatives to expansion of O'Hare. SOF 64; AR-0016843, AR-0016849-54.

[32] Because FAA stated that the blended alternative would meet project purpose and need and was not cost prohibitive, this case is different from other circumstances where courts have accepted FAA and Corps conclusions that off-site alternatives to airport expansion would not meet the project purpose and need. *See, e.g., Graves*, 280 F. Supp. 2d at 1221-22; *Alliance for Legal Action*, 314 F. Supp. 2d at 534.

[33] The 2003 Aviation Act provides that the Corps must accept the FAA definition of project purpose. "For any environmental review, analysis, opinion, permit, license or approval that must be issued by a Federal or State agency that is participating in a coordinated environmental review process under this section that requires an analysis of purpose and need for the project, the agency, notwithstanding any other provision of law, shall be bound by the project purpose and need as defined by the Secretary." 49 U.S.C. § 47171(j). Since the FAA found that the blended alternative would meet project purpose and need (although it rejected the alternative as not reasonable on other grounds), 49 U.S.C. § 47171(j) does not bar the Corps from full compliance with the CWA practicable alternatives test. Moreover, 49 U.S.C. § 47171(k), which addresses FAA selection of alternatives, applies only to NEPA and does not change the Corps' CWA duties.

owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

On the record, the blended alternative would meet purpose and need and would cost less than other alternatives, meeting the definition of "practicable."

There may be other practicable alternatives, but the Corps' record clearly demonstrates that the blended alternative should have been analyzed under the "practicable alternatives" standard. Failure to do so is reversible error.

B.     SELECTING IN-LIEU FEE AS MITIGATION WAS ARBITRARY CAPRICIOUS AND INCONSISTENT WITH LAW

1.     The Corps' Approval Of The OMP In-Lieu Fee Was Arbitrary

While the Corps has discretion to establish Section 404 permit terms, including mitigation terms, the Corps abused its discretion here, by approving an in-lieu fee arrangement that conflicts with multiple standards guiding mitigation selection. Courts have rejected the "fill now, mitigate later" approach of in-lieu fees as so uncertain as to be unlawful under the CWA:

> While a certain amount of flexibility in a mitigation plan is necessary and advisable, there must be enough definition to allow for a meaningful review and evaluation of the plan to ensure that it would be successful. An agency must exercise particular care when the mitigation requires restoration of a large number of acres and the location of those restored acres is critical to, e.g., limiting groundwater seepage. While the use of a mitigation fee per ton positively correlates to the amount of impact, it also creates difficulties by shifting the focus to "mine now, mitigate later" since the mining will take place first, followed by payment of the fee, then followed by expenditures for mitigation.

*Flowers*, 423 F. Supp. 2d at 1323-24 (footnote omitted).[34]

---

[34] The OMP mitigation determination challenged here is unlike *Alliance for Legal Action*, in which the court upheld the Corps' mitigation choices. *See* 314 F. Supp. 2d at 553-55. Unlike the disagreements over technical matters at issue in *Alliance for Legal Action*, here, the Corps' decision is directly contrary to governing mitigation standards.

The Corps, EPA and scientists addressing mitigation all emphasize that the key to successful mitigation rests on the appropriate site selection and approval of specific mitigation plans.[35] The EPA and FWS insisted throughout the review of the OMP permit that details of the mitigation credits was essential.[36] The in-lieu fee arrangement approved here does not provide these critical requirements and as such is arbitrary and unreasonable.

### 2. The Corps Failed To Follow Applicable Mitigation Standards

The OMP in-lieu fee arrangement is an elaborate paper system that promises to implement 280.14 acres of actual mitigation at some point in the future. Under its existing standards for mitigation, it was unreasonable for the Corps to decide that the OMP could shift its mitigation liabilities to CorLands and in the process defer actual mitigation for many years. The Corps failure to comply with its own interpretation of its duties is arbitrary and capricious.[37] *See Rhodes v. Johnson,* 153 F.3d 785, 789-90 (7th Cir. 1998) (finding that the agency's failure to abide by its "interpretation of its own implementing procedures" violated 5 U.S.C § 706(2)(A)).

---

[35] *See, e.g.,* AR-0021941-44 (NAS Report, Executive Summary); Proposed Mitigation Rule, 71 FED. REG. at 15535-39 (proposed 33 C.F.R. §§ 332.3 and 332.4); AR-0022266-69 (RGL 02-02); AR-0021802-07 (Chicago District Mitigation Guidelines, echoing these requirements).

[36] AR-0020699-701 (FWS letter); AR-0020702-04 (EPA letter); E-mail from Sue Elston, EPA, to John Rogner, FWS, *et al.* (Nov. 2, 2005; 12:49 p.m.); *see also,* E-mail from Sue Elston, EPA, to Ted Woosley, Consultant, OMP, *et al.* (Nov. 10, 2004; 4:44 p.m.) ("[A]t a minimum we would be looking for information on the mitigation site locations, soils, existing conditions, how the wetland restoration will be accomplished and what wetland communities will be established at each mitigation site. Before EPA is willing to provide our final comments on the Section 404 application we want to see a monitoring plan, performance standards, and long term management plans for the mitigation sites.").

[37] As noted above, the Corps Proposed Mitigation Rule would eliminate use of in-lieu fee arrangements. Headquarters of the Corps, which was drafting the Proposed Mitigation Rule during 2005, noted that use of an in-lieu fee for OMP impacts was unusual. *See, e.g.,* E-mail from Mitchell Isoe, Corps, to Col. Gary Johnston, Corps (Sept. 23, 2005; 5:06 p.m.) ("HQ is concerned because it is the first time something like this has been done."); E-mail from Katherine Trott, Corps HQ, to Mitchell Isoe, Corps, *et al.* (Sept. 15, 2005; 11:54 a.m.) ("We have a concern regarding the amount of money and mitigation requirements that this agreement would be providing."). Plaintiffs believe that the Chicago district was aware of the terms of the Proposed Mitigation Rule when it issued the OMP Permit.

a.    The OMP Mitigation Had To Be Approved As Mitigation Bank

Corps' standards require that when an in-lieu fee is used for mitigation for impacts under an individual permit, it must be approved as a mitigation bank. AR-0021897 (ILF Guidance, Section III(A)). The OMP in-lieu-fee was not approved as a mitigation bank. Various comments noted this requirement, including the FWS. AR-002084.[38] This failure is reversible error.

The Corps cannot seriously contend that the OMP in-lieu-fee was approved as a mitigation bank. In its response to comments on this point, the Corps called the arrangement an in-lieu fee, and cobbled together isolated provisions from both the ILF Guidance and the MB Guidance in support of its position. AR-0020607-13 (ROD). The OMP arrangement did not have the detailed site specific mitigation plans required of a mitigation bank. *See* AR-0021903 (MB Guidance Sec. II (B)(1),(2) & (3)). The prospectus was not available for public review and comment as required. *Id.* at AR-0021905 (Sec. II(C)(5)). Notably, the Corps failed to link the payment of the fee and the release of permittee liability to demonstration of mitigation success, which is a requirement of mitigation banks. *Id.* at AR-0021906-07 (Sec. II(D) & (E)). The mitigation bank requirements provide assurance that the individual permit holder is not "off the hook" for mitigation until actual mitigation is provided.[39] *Id.*

---

[38] As the Sierra Club commented, "[m]itigation without detail or explanation is not really mitigation. In other words just sending a check to CorLands with vague requirements to use it for wetlands is not sufficient for the approval of legally required mitigation. A specific detailed plan for each acre of impact is essential." AR-0020798 (September 12, 2005 letter).

[39] The OMP permit itself illustrates the requirements imposed on a mitigation bank. For the 62.26 acres of mitigation credits provided by the Lily Cache Mitigation Bank, the Corps had a known, secured site, with a banking instrument that included an approved mitigation plan, financial assurances, performance standards and other criteria. The $4,544,980.00 fee for these 62.26 credits is being held by the North Cook County Soil & Water Conservation District, AR-0020677, with payments to Lily Cache phased to relate to performance of actual mitigation. In contrast, the OMP in-lieu fee has none of these mitigation bank assurances.

b.     The OMP Mitigation Fails To Satisfy Mitigation Criteria

The OMP in-lieu fee also violates other provisions of mitigation guidance. Section III(B) of the ILF Guidance clearly states that: "As a general matter, in-lieu fee mitigation should only be used to compensate for impacts to waters of the U.S. authorized by a Section 404 general permit[.]" AR-0021897. This goes hand in hand with the requirement that in-lieu fees used for individual permits must be approved as mitigation banks. *Id.* General permits are established under Section 404(e), for activities that the Corps has determined do not, individually or cumulatively, have significant impacts. 33 U.S.C. § 1344(e). Many of the nationwide general permits have acreage limits that restricts their use to small impacts. *See* Issuance of Nationwide Permits, 67 FED. REG. 2019, 2077-89 (Jan. 15, 2002).

Many comments emphasized that an impact of 97.1 acres was too large an impact for an in-lieu fee. *See, e.g.,* AR-0020804 (October 17, 2005 letter from FWS, noting that "[i]nlieu fee programs with their inherent uncertainties are best suited for aggregating many small and minor impacts normally authorized under general permits."); *see also* AR-0020799 (September 12, 2005 letter from Sierra Club); AR-0020792 (October 12, 2005 letter from two Congressmen); AR-0020819 (October 10, 2005 letter from Applied Ecological Services).[40] The Corps' response to these comments was the unreasonable statement that there is no flat prohibition on use of in-lieu fees based on size. AR-0020607 (ROD).

It makes no sense that the strict requirements of the ILF Guidance would be applied where an in-lieu fee was used for small impacts, but may be ignored where, as here, the permittee must compensate for a significant impact. Yet that is what the Corps did, stating that

---

[40] The GAO Report also noted that "Corps and EPA officials told us that they typically approve the use of in lieu-fee arrangements as mitigation measures for minor impacts and when adversely affected acreage is relatively small." AR-0021830.

the specifics of the ILF Guidance were not applicable because they only apply for general or nationwide permits. Although the OMP project was too large to qualify for a general permit, the ILF Guidance establishes careful, strict standards that would apply to a fee arrangement used for general permit impacts. *See generally,* AR-0021895-99. These requirements are to provide some assurance that an in-lieu fee arrangement will perform adequately. Similarly, RGL 02-02 and the Chicago District Mitigation Guidelines provide standards for appropriate mitigation. The OMP in-lieu fee does not meet the letter or spirit of these established criteria.

The ILF Guidance is clear that "use of a mitigation bank is preferable to in-lieu-fee mitigation where permitted impacts are within the service area of a mitigation bank approved to sell mitigation credits and those credits are available." AR-0021897 (Sec. III.B.2.) For this reason, when an in-lieu fee is used for general permit impacts, Section IV(A)(2) requires the in-lieu fee sponsor to notify the Corps "if the service area of any mitigation bank overlaps the jurisdiction in which their in-lieu-fees may be spent." AR-0021898. There is no indication in the record that the Corps or OMP identified the mitigation banks in the service area of the proposed in-lieu fee or explained why an in-lieu fee should be approved with such an overlapping service area.[41]

Section VI(A)(7) of the ILF Guidance requires the Corps to assure that the funds collected are "based upon a reasonable cost estimate of all funds needed to compensate for the impacts to wetlands[.]" AR-0021898. Many comments raised concern about how the OMP fee was set.[42] *See, e.g.,* AR0020796 (October 12, 2005 letter from Hey & Associates, Inc.), AR-

---

[41] To the contrary, the ICA, Section 6.A, defines the geographic service area for the in-lieu fee as the same as provided for mitigation banks, but fails to identify any existing mitigation banks within that service area. AR-0020636. Available mitigation banks in the OMP in-lieu fee service area can be found at http://www.lrc.usace.army.mil/co-r/mitbank.jpg.

[42] FWS stated:

0020815 (October 10, 2005 letter from NMBA). The Corps ROD presents a conclusory statement that: "The amount of monies advanced by the OMP for compensation was calculated by Corlands based on the cost of acquisition, development and implementation of mitigation sites." AR-0020611. However, there is no information in the record supporting that conclusion. The Corps' record has no spreadsheets or other information from OMP or CorLands explaining how the fee was set. As such, there is no evidence that the Corps independently evaluated the fee level, much less made sure that the funds would be adequate to compensate for the impacts. The $26,466,429.00 fee may be too low, too high, or just right, but there is no basis on which to conclude that the Corps did its job to make that assessment.

The Corps failed to require any protections that would secure the OMP mitigation fee against financial loss.[43] The $26,466,429.00 fee is not being held by a bonded third party escrow, but rather is in CorLands accounts. The Corps advised CorLands that it would not even be tracking the funds:

> CorLands controls the money totally. If you feel you need to spend some to assure yourselves that a project is feasible **before** you propose it, that is your call.

---

[D]etails of the financial arrangements between the applicant and CorLands were not specified in the public notice. The ultimate cost of mitigation will depend on many factors, including whether land acquisition is required, specific mitigation goals, methods of habitat restoration employed, level of monitoring required, need for corrective measures, etc. Prior to becoming a signatory to an in-lieu-fee agreement, we request a detailed rationale for the amount of funding provided to CorLands so that the MRT has a reasonable level of assurance that the funds will be adequate, at a minimum, to fully accomplish a model mitigation program of a type that might ultimately be proposed by CorLands.

AR0020805. FWS also stated "One thing that seems to be a glaring omission is that the financial arrangements. How will anyone know if the dollars are sufficient to do what they need to do in terms of mitigation?" E-mail from John Rogner, FWS, to Kathy Chernich, Corps, *et al.* (Aug. 12, 2005) (enclosing October 11, 2005 WLI in-lieu fee letter at p. 7). EPA raised similar concerns. AR0020808.
[43] The ICA does not require that the individual projects that may be selected have financial assurances. *Compare* AR-0020638 (ICA, E.3.), *with* AR-0021908 (MB Guidance) *and* AR-0021899 (ILF Guidance); *see also*, E-mail from Mitchell Isoe, Corps, to Sue Elston, EPA, and John Rogner, FWS (Aug. 11, 2005; 8:41 a.m.) (attached to August 11, 2005 email at 10:37 a.m.) (stating that bonds may not be required for individual projects).

> Your obligation is to provide the minimum of 280.14 credits of mitigation. We will not be tracking funds. The important issues of funding detailed in the agreement were there to assure that contingency planning was part of the process. Whatever projects you propose will be assumed to be financially reasonable.

E-mail from Mitchell Isoe, Corps, to Joe Roth, Corlands, *et al.* (Dec. 5, 2005; 9:41 a.m.). The mitigation funds are for a public purpose, to establish 280.14 acres of wetland mitigation. It is unacceptable for the Corps to have no requirements that will secure this money for its ultimate public purpose.

The Corps did not provide the public with notice and an opportunity to comment on the in-lieu fee prospectus. The MB Guidance Sec II(C)(5) provides that "upon receipt of a complete banking prospectus" a minimum 21 days public notice period is required. AR-0021905. The Corps knew of this requirement[44], but nonetheless failed to follow it. The Corps ROD offers the erroneous explanation that neither the MB nor ILF Guidance requires comment on the prospectus. AR-0020610.

ILF Guidance Section IV(A)(7) provides that "[l]and acquisition and initial physical and biological improvements should be completed by the first full growing season following collection of the initial funds." AR-0021898. This time period can be extended only when timely initiation is not practicable and mitigation ratios are increased to account for temporal losses. *Id.* Similar timing restrictions are required by RGL 02-02, which states that when mitigation will be accomplished after wetlands impacts, there must be, in advance, an approved mitigation plan, a secured mitigation project site, and appropriate financial assurances in place. AR-0022265 (Sec. 2(a)). RGL 02-02 also reiterates that "initial physical and biological

---

[44] AR-0020749 (Aug. 3, 2005 e-mail from Corps to FAA) ("According to the requisite guidance we have to follow, we have to be in receipt of a complete prospectus before we can put the ILF piece on notice. While we can put out a notice on the mitigation, we would have to put another notice out upon receipt of a complete prospectus. I think we would all agree that a single notice would be best."); *see also*, E-mail from Michael MacMullen, FAA, to Mitchell Isoe, Corps, *et al.* (Aug. 16, 2005; 2:07 p.m.).

improvements" should be completed no later than the first full growing season" after the impacts, absent other measures to provide for temporal loss. *Id.* Contrary to these requirements, the Corps has allowed the OMP in-lieu fee a phasing of mitigation site selection and implementation of projects that, on paper, extends for three years and may in fact extend longer. AR-0020634, AR-0020640. The Corps provided no explanation of why prompt initiation of projects is not practicable, nor does the record reflect that the mitigation ratios were increased to account for the delays.

ILF Guidance Section IV(A)(1) requires the Corps to "carefully evaluate" the qualifications of the proposed fee provider. AR-0021898. Comments raised serious questions about CorLands' qualifications:

> The previous fee inlieu fiasco was a windfall for parties needing mitigation because the value of a mitigation credit was too low. CorLands and Chicago District personnel were responsible for that program that mocked other mitigation projects. This is not the track record of a successful program.

AR0020796 (October 12, 2005 letter from Hey & Associates, Inc);[45] *see also* E-mail from Kathy Chernich, Corps, to Ted Woosley, Consultant, OMP, (Nov. 1, 2005; 5:47 p.m.) (enclosing WMI's in-lieu fee letters). The Corps provided a conclusory response rejecting these comments, AR-0020611 (ROD), but the record presents no meaningful analysis of CorLands' qualifications.

ILF Guidance Section IV(B) requires that in-lieu fee arrangements be established in a formal agreement with the Corps and other agencies. AR-0021899. The in-lieu-fee agreement

---

[45] This comment also states:

> We strongly object to the role defined for CorLands in this process. CorLands was involved in the previous fee-in-lieu program that was not held to the same standards as other on- and off- site mitigation projects including wetland banks. This process was highly controversial and an insult to other parties that were following Corps mitigation rules. Documentation regarding CorLands administration of those funds is not presented in the Public Notice.

AR0020795.

must have many details, including the sponsor's experience and qualifications, potential site locations (with baseline biological information), geographic service area, accounting procedures, methods for determining fees and credits, a schedule for work, performance standards, reporting, financial and legal provisions for remedial actions, financial and legal provisions for long term management, and a statement concerning legal responsibility of the fee provider.

The need for these specific details in a mitigation proposal is at the heart of RGL 02-02, which requires similar details for compensatory mitigation plans, AR-0022266-69. The Chicago District Mitigation Guidelines echo these requirements. AR-0021802-07. The Society of Wetland Scientists stated "Successful wetland mitigation requires agreement among the regulatory authorities and the proponents on size, type, timeline, required and desired functions, management, funding and oversight. Good science, design, construction and maintenance must support all this."[46] Similar criteria are emphasized as key in the Proposed Mitigation Rule, 71 FED. REG. at 15535-39 (proposed 33 C.F.R. §§ 332.3 and 332.4.)

The OMP ICA contains none of the specific information required of a mitigation proposal. AR-0020633-40. Rather it establishes a process under which some, but not all, of these requirements are to be met at some time in the future, when specific mitigation projects are selected. Corps approval of this arrangement was unreasonable.

> c.    The OMP In-lieu Fee Does Not Qualify As An Umbrella Arrangement

The Corps responded to the particular issues identified above by trying to justify the OMP in-lieu-fee as an "umbrella" program. AR-0020612. The MB Guidance authorizes "umbrella" arrangements as an administrative convenience:

---

[46] *See Wetland Mitigation Banking, available at* www.sws.org/wetlandconcerns/banking.html.

> For regional banking programs sponsored by a single entity (e.g. a state transportation agency) it may be appropriate to establish an "umbrella" instrument for the establishment and operation of multiple bank sites. In such circumstances the need for supplemental site-specific information (e.g. individual site plans) should be addressed in the banking instrument.

AR-0021904. The OMP arrangement is not a "regional banking program." Moreover, nothing in the MB Guidance would allow an umbrella mitigation bank to accept funds (and excuse a permit holder from liability) <u>prior to providing the site-specific mitigation information required under the MB Guidance.</u> This is because, for a mitigation bank (whether umbrella or not), release of credits and collection of funds is allowed only in relation to achieving performance milestones. AR-0021906-07.

The ILF Guidance did not modify the circumstances where "umbrella" arrangements might be appropriate nor provide any further definition of "umbrella" arrangements.[47] Because the OMP in-lieu fee was for individual permit impacts, it had to be approved as a mitigation bank and, if it was an umbrella mitigation bank, it should not have been allowed to collect funds before demonstrating compliance with all requirements for mitigation banks. *See* AR-0020815 (October 10, 2005 letter from NMBA); WMI in-lieu fee letters.

The Corps' interpretation of "umbrella arrangements" would create an untenable loophole in the structure established by the MB Guidance, the ILF Guidance, RGL 02-02 and all other mitigation policies. Why would any mitigation provider go through the effort of detailed planning required by these standards when it could simply seek approval as an "umbrella," collect its fees up front and only promise to do the hard work of finding sites and implementing mitigation later? Under the Corps' position, as long as the arrangement is labeled an "umbrella", the fee provider could collect 100% of the money when it had 0% of the details necessary to

---

[47] ILF Guidance Section IV(B) (which applies only for general permits) provides only that an "umbrella" in-lieu-fee arrangement may be used for "the establishment and operation of multiple sites."). AR-0021899.

42

assume real mitigation.[48]  Such a construction is contrary to the purposes of mitigation under the CWA and should be rejected.

The Corps abused its discretion by ignoring multiple standards that guide the selection of mitigation.  The in-lieu fee mitigation selection should be overturned.

C.    THE CORPS HAD ALTERNATIVE MITIGATION AVAILABLE THAT SHOULD HAVE BEEN SELECTED

The Corps' record provides evidence that there was ample, actual mitigation available for OMP, but the Corps' stated that it approved the in-lieu fee arrangement because OMP had failed to provide sufficient mitigation sites. AR-0020608-09 (ROD).  The Corps' conclusion that there was not sufficient actual mitigation available is very odd.  If there was insufficient mitigation available to OMP in 2005, after its multiple searches for mitigation sites, it is hard to understand how the Corps could conclude that some in-lieu fee provider would be able to find mitigation sites.

Indeed, the Corps record reflects information that there was sufficient mitigation available in 2005 for use by OMP, but that the Corps wasn't going to take the time to select and approve actual mitigation sites.  *See* Facts Section, *supra*.  The Corps itself felt that OMP's mitigation site search had generated good potential sites.[49]   However, the Corps engaged in irrational reasoning in accepting or rejecting sites.  For example, the Corps "rejected" the Neal Marsh site when offered by OMP, but also stated that it could be acceptable as part of the in-lieu

---

[48] The potential for the mitigation provider to "take the money and run" makes this system untenable. Since the permittee would no longer be liable for the mitigation (after approval of an in-lieu fee payment), the Corps would be left with limited enforcement abilities to protect wetlands and the public interest.
[49] The Corps said in 2005 that the mitigation sites identified by OMP in 2003 and 2004 continued to have potential.  AR-0022709-10; *see* September 16, 2005 WLI in-lieu fee letter.

fee arrangement. See facts above. Indeed, as late as May 2005, the OMP and FAA thought that Neal Marsh and other sites were still being actively considered.[50]

Other sites were also available. The Cedar Creek site, proposed as a 300 acre mitigation bank in 2005, would have provided available credits for OMP. *See* AR-0002863-69 (July 8, 2005 letter from WMI to Corps *et al.*); s*ee also* Sept. 16 and Oct. 10, 2005 WLI in-lieu fee letters. FWS asked about use of Cedar Creek for OMP impacts in October 2005. E-mail from Jeffrey Mengler, FWS, to Jon Abrant, Corps (Oct. 24, 2005; 12:27 p.m.) (attached to November 2, 2005 e-mail from Corps to FWS). Other comments in 2005 reminded the Corps that specific sites were available and should have been selected. AR-0020818-19 (October 10, 2005 letter from Applied Ecological Services); AR-0020822-23 (October 4, 2005 letter from Wetland Research, Inc.).

Under all governing mitigation policies, known mitigation, identified and approved in advance of impacts, is preferred.[51] Since there were adequate actual mitigation sites available, it was arbitrary for the Corps to defer selection of mitigation through use of an in-lieu fee arrangement.

D.     THE RECORD REFLECTS PRESSURE ON THE CORPS TO MEET A PRE-ESTABLISHED SCHEDULE FOR PERMIT ISSUANCE

Given the flaws in the Corps' mitigation decision, what was the reason for the shift in approach to mitigation sometime in late 2004 or early-2005? The record reflects that the Corps was under serious pressure from FAA to meet a pre-established deadline for permit issuance.

---

[50] E-mail from Michael MacMullen, FAA, to Ted Woosley, Consultant, OMP, *et al.* (May 10, 2005; 2:37 p.m.) (referencing Lily Cache and Heron Creek); E-mail from Michael MacMullen, FAA, to Chernich, Corps, *et al.* (May 26, 2005; 7:58 a.m.) ("Any progress on determining the extent of potential use of Neal Marsh and/or Lily Cache sites for mitigation credits?").

[51] *See, e.g.,* Proposed Mitigation Rule, 71 FED. REG. at 15538; AR-0022264-65 (RGL 02-02); AR-0021797-801 (Chicago District 2004 Mitigation Requirements); AR-0021940-41, AR-0021945 (NAS Report).

Review of specific mitigation sites and plans would have taken time. It appears that the Corps short-changed its duties under the CWA in order to issue the OMP permit on an accelerated schedule.

Plaintiffs recognize that federal law encourages agencies, such as the Corps, to cooperate closely with FAA on the schedule for permits for airport enhancements. 49 U.S.C. § 47171(a)(2).[52] The law, however, does not direct or sanction the Corps to ignore its legal authorities solely to meet an FAA schedule.

This record reflects pressure on the Corps to meet the pre-determined schedule. *See* Fact Section, *supra*. After the Corps advised OMP in April 2005 that it needed additional mitigation sites, AR-0022709, FAA made it very clear that the "mitigation concerns" could not delay permit issuance:

> I think it is imperative that we think in terms of scheduling an FAA/City/MRT
> discussion as soon as reasonably feasible . . . [W]e need to know [what is needed]
> … as satisfactory resolution of MRT's expressed mitigation concerns. <u>By the</u>

---

[52] The section provides:

> Aviation Project Review Process. - The Secretary of Transportation shall develop and implement an expedited and coordinated environmental review process for airport capacity enhancement projects at congested airports, aviation safety projects, and aviation security projects that - (1) provides for better coordination among the Federal, regional, State, and local agencies concerned with the preparation of environmental impact statements or environmental assessments under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); (2) provides that all environmental reviews, analyses, opinions, permits, licenses, and approvals that must be issued or made by a Federal agency or airport sponsor for such a project will be conducted concurrently, to the maximum extent practicable; and (3) provides that any environmental review, analysis, opinion, permit, license, or approval that must be issued or made by a Federal agency or airport sponsor for such a project will be completed within a time period established by the Secretary, in cooperation with the agencies identified under subsection (d) with respect to the project.

49 U.S.C. § 47171(a)(2).

The consequence of an agency not meeting an FAA schedule is notification to Congress and the Council on Environmental Quality. *See* 49 U.S.C. §47171(i).

> phrase "satisfactory resolution", <u>I mean adequate to allow for potential permit issuance essentially concurrent with FAA's ROD approval,</u> but probably prior to specification of the exact site(s) where the mitigation would actually be provided.

E-mail from Michael MacMullen, FAA, to Kathy Chernich, Corps, *et al.* (April 15, 2005; 8:20 a.m.) (emphasis added). Under the CWA, however, the Corps is required to address mitigation concerns properly, not just "timely" to meet FAA's schedule.

As summarized above, this was not the first or only time that FAA insisted that the Corps meet its pre-determined schedule for permit issuance. *See* Fact Section, *supra.* When FAA thought the Corps was proceeding too slowly, it sent blistering reminders of the schedule commitments. Email from Michael MacMullen, FAA, to Kathy Chernich, Corps, *et al.* (Aug. 30, 2005; 7:36 a.m.).

The Corps' actions – rushing the permit issuance without compliance with law cannot be excused. In *Flowers*, the court set aside a Corps permit on a record with similar evidence:

> The Court has studied this case very carefully, and is disturbed by the fact that so many strong objections to the issuance of these permits had been raised by other governmental agencies, as well as by individuals, and that the administrative record reveals an urgency and pre-determination about the decision-making process that may have resulted in a less than full consideration of important issues. Most importantly, such a rushed approach to the agencies' specifically charged duties is contrary to the dictates of the federal environmental laws, both procedurally and substantively, and leaves this Court with the inescapable conclusion that the decision-making process suffered from substantial deficiencies which resulted in agency decisions that were not in accordance with these laws.

423 F. Supp. 2d at 1287 (footnote omitted)

## CONCLUSION

For the above stated reasons, Plaintiffs request that the Court enter summary judgment in their favor on all counts of its First Amended Complaint. Plaintiffs seek a final judgment from this Court: (a) declaring that Corps authorization of an in-lieu fee arrangement for Permit

200301000 was arbitrary, capricious and not in accordance with law; (b) declaring that the Corps

violated NEPA and the CWA; (c) requiring that the Corps correct its errors by withdrawing or

suspending the unlawful in-lieu fee provisions of Permit 200301000;  (d) requiring the Corps to

order OMP and the in-lieu fee provider to stop all funding of in-lieu-fee wetland mitigation

under the permit;  (e) prohibiting the Corps from authorizing any further spending of money

under the in-lieu-fee arrangement related to the OMP;  (f) requiring the transfer all monies paid

for the in-lieu fee mitigation into a court supervised or third party interest bearing escrow

account until the Corps has remedied its violations of federal law, (g) prohibiting the Corps from

taking any other action which in any way supports or furthers funding the in-lieu-fee wetland

mitigation for the project until the Corps has remedied its violations of federal law and (h)

providing such other relief as this Court deems necessary and appropriate.


/s/   *John A. Lee*                                   
Jan M. Michaels
John A. Lee
Michaels & May, P.C.
Sears Tower
233 S. Wacker Drive, Suite 5620
Chicago, IL  60606
Phone: (312) 428-4720
Fax: (312) 575-8679
jmichales@michaelsmay.com
jlee@michaelsmay.com

Michaels R. Fitzpatrick (pro hac vice pending)
Brennan Steil and Bastings, S.C.
One East Milwaukee Street
P.O. Box 1148
Janesville, WI  52547-1148
Phone: (608) 756-4141
Fax: (608) 756-9000
mfitzpatrick@brennansteil.com

Margaret N. Strand (pro hac vice pending)
Venable, LLP
575 7th Street, NW
Washington, DC  20004-1607
Phone:  (202) 344-4699
Fax: (202) 344-8300
mstrand@venable.com

COUNSEL FOR NATIONAL MITIGATION
BANKING ASSOCIATION, LAND AND
WATER RESOURCES, INC., WETLANDS
MITIGATION OF ILLINOIS, L.L.C., and
WETLANDS RESEARCH, INC.