**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL MITIGATION BANKING ASSOCIATION; LAND AND WATER RESOURCES, INC.; WETLANDS MITIGATION OF ILLINOIS, L.L.C; and WETLANDS RESEARCH, INC.,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 06-cv-2820** |
| | ) | **Judge Joan H. Lefkow** |
| **UNITED STATES ARMY CORPS OF ENGINEERS; COL. GARY E. JOHNSTON, in his official capacity as District Engineer of the Chicago District; and MITCHELL A. ISOE, in his official capacity as Chief of the Regulatory Branch of the Chicago District,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

I.      Introduction

The City of Chicago ("the City") has a plan to address the ubiquitous delays that plague

O'Hare International Airport.[1]  This plan, the O'Hare Modernization Program (the "OMP"),

involves filling wetlands within airport grounds.  On December 19, 2005, the United States

Army Corps of Engineers (the "Corps" or "USACE") issued a permit to the City under Section

404 of the Clean Water Act allowing it to fill 97.1 acres of wetlands in furtherance of the OMP.

As a condition of the permit, the Corps required the City to satisfy certain requirements to

mitigate the

───────────────

[1] See *Suburban O'Hare Comm'n* v. *Dole*, 787 F.2d 186, 187-191 (7th Cir. 1986), for a history of O'Hare Airport and litigation surrounding its development.

environmental damage. The first requirement was that the City pay approximately $4.5 millon

to a mitigation bank provider in exchange for 62 acres' worth of mitigation credits, and the

second was that the City pay a $26 million fee to an in-lieu fee provider that agreed to undertake

an additional 280 credits of mitigation.

Plaintiffs are three Illinois companies: Wetlands Research, Inc. ("WRI"); Land and Water

Resources, Inc. ("LAWR"); and Wetlands Mitigation of Illinois, L.L.C. ("WMI") and a national

membership association to which they belong, the National Mitigation Banking Association

("NMBA") (collectively, "plaintiffs"). Defendant United States Army Corps of Engineers ("the

Corps") is a federal agency; defendant Colonel Gary E. Johnston ("Johnston") was District

Engineer of the Chicago District of the Corps at the time that the Section 404 permit was issued

to the City; and defendant Mitchell A. Isoe ("Isoe") is Chief of the Regulatory Branch of the

Chicago District of the Corps (collectively, they are referred to as "defendants" or "the Corps").

Plaintiffs claim that in issuing this permit, the Corps violated its duties under the National

Environmental Policy Act ("NEPA") and the Clean Water Act (the "CWA"). They filed their

complaint in this case exactly five months after the permit was issued (on May 19, 2006).

Complaint, Dkt. No. 1.

This court has jurisdiction under 28 U.S.C. § 1331. The parties' cross-motions for

summary judgment were fully briefed on October 17, 2006. On November 9, 2006, the parties

filed a joint motion for a hearing and also requested a resolution of the case as quickly as

possible based on the possibility of disbursement of funds by the in-lieu fee provider. Dkt. No.

43. Oral argument was held on November 30, 2006. After a thorough review of the parties'

materials and the administrative record, the court now denies plaintiffs' motion for summary

judgment [#19] and grants defendants' cross-motion [#25].

II.     Facts

    A.     Background

    O'Hare International Airport ("O'Hare") is one of the busiest airports in the world.

Administrative Record ("AR"), at 11010; 103393-94.  It plays a vital role in our National

Airspace System as an airline hub, a large mid-continent market, and a key international

gateway.  *Id*.  O'Hare is also a major contributor to delays.  *Id*.  In 2003, it experienced more

delays than any other airport in the country: a total of 3,840,493 minutes.  AR-11010.  Every

day, an average of 189 planes were "significantly delayed," meaning delayed by more than 15

minutes.  *Id*.  Due to the significant role that O'Hare plays for connecting traffic, this level of

delay affects many other airports and causes further inefficiencies throughout the National

Airspace System and, literally, the whole world.  AR-103402.  The Federal Aviation

Administration (the "FAA") has determined that one major cause for this is inadequate all-

weather airfield capacity afforded by the airport's current configuration.  AR-103394.  The FAA

forecasts that demand at O'Hare will continue to grow and that by 2018 it will serve

approximately 50 million passengers per year.  AR-103393-94.

    On June 29, 2001, the City's Mayor, Richard M. Daley, announced a plan to enhance the

capacity and efficiency of O'Hare, which eventually evolved into the the OMP.  AR-103392.

The City proposed to enhance capacity and reduce delay by modernizing O'Hare's runway

system and constructing multiple parallel runways to replace O'Hare's triangular runway layout.

Defendants' Br., at 10 (citing AR-103392); AR-10547.  The City requested FAA approval of this

proposal in 2002, which triggered the need to prepare an environmental impact statement for the project pursuant to NEPA. Defendants' Br., at 10. In addition, because the project involved the filling of wetlands, the City needed to obtain a Section 404 individual permit from the Corps pursuant to the CWA. *Id.*

O'Hare is located within the Des Plaines River watershed, which is an area encompassing more than 300,000 acres, 15 sub-watersheds, and parts of Illinois and Wisconsin. Defendants' Statement, at ¶ 3. The wetlands that would be affected by the OMP are mostly small, isolated sites on O'Hare property that have low functional value for water quality and wildlife habitat. AR-11044; 13562-65. They reflect the urban stresses associated with an international airport that is surrounded by residential, commercial, and industrial land use. AR-13564-65. The O'Hare wetlands are not open to the public. AR-18959. Furthermore, the U.S. Department of Agriculture maintains a staff at O'Hare to deter birds and animals from using the undeveloped land because of the danger that the wildlife poses to airplanes in the surrounding airspace. AR-13513. Some of the undeveloped land, however, is still used as a wildlife habitat. AR-13512.

Plaintiffs share a common interest in creating, restoring, enhancing, and preserving Chicago-area wetlands, and in promoting wetland science and education in general. Affidavit of Donald Hey, Ex. 2 to Plaintiffs' Reply ("Hey Aff."), at ¶¶ 3, 6, 7; Affidavit of John Ryan, Ex. 3 to Plaintiffs' Reply ("Ryan Aff"), at ¶¶ 3-4; Defendants' Statement, at ¶ 1. WRI, LAWR, and WMI have pursued this interest through developing mitigation banks in and around the Des Plaines River watershed. Hey Aff., at ¶ 5; Ryan Aff., at ¶¶ 3, 4, 8, 27; Affidavit of David T. Urban, Ex. 1 to Plaintiffs' Reply ("Urban Aff."), at ¶ 10; Affidavit of Steve Weller, Ex. 4 to Plaintiffs' Reply ("Weller Aff."), at ¶ 7. Plaintiffs proposed several of their mitigation sites as

potential mitigation for the OMP's wetland impacts, but only one was approved. Hey Aff., at ¶¶ 27, 28; Ryan Aff., at ¶ 19; AR-23394; 20677; Defendants' Br. At 12.[2]

The City started searching for potential mitigation bank sites for its Section 404 permit in the middle of 2002, more than two years before it filed its application with the Corps and three years before the Corps issued the permit. Plaintiffs' Statement, at ¶ 13; AR-18963. The City contracted for an assessment of available offsite mitigation, which resulted in a March 2003 report entitled "O'Hare Modernization Project: Wetland Mitigation Options." *Id.* At a meeting with the Corps and others on September 17, 2003, the City presented the results of this study, and the City's consultant reported that "many potential sites are available." *Id.* at ¶ 14. A PowerPoint presentation at that meeting showed a schedule that had the City selecting the mitigation sites first and filing its permit application thereafter (this schedule was a part of the City's "conceptual" plan, however, and the cited document did not state that the timing arrangement was mandatory). Plaintiffs' Statement, at ¶ 15.

In the Spring of 2004, the City issued a request for proposals ("RFP") to mitigation providers for potential mitigation bank sites. The RFP generated at least 14 responses. Plaintiffs' Statement, at ¶ 16; Defendants' Statement, at ¶ 14. When the City finally filed its Section 404 permit application in November of 2004, it included information regarding these sites along with a description of its conceptual mitigation plan. Plaintiffs' Statement, at ¶ 17; AR-18963-77. In meetings held at the same time that the application was filed, the proposed mitigation plan was explained, and the City provided a draft timetable that had mitigation site

---

[2] More detailed information regarding the plaintiffs can be found in the standing section of this opinion.

selection and approval predating permit issuance. Plaintiffs' Statement, at ¶ 18. There was no statement in the timetable that this sequence of events was mandatory. AR-23573.

The City's Section 404 permit application stated that the OMP would impact 153 acres of wetlands and "Waters of the United States." AR-18965. This included 92.7[3] acres of wetlands within the jurisdiction of the Corps. *Id.* Approximately 414 mitigation bank credits were proposed to mitigate for the loss. AR-18969. The Section 404 permit application itself is a four-volume document that is hundreds of pages long. It contains detailed information regarding the background of the OMP, a description of the project, the history of the O'Hare wetlands, potential damage that the OMP would do to the ecosystem, a discussion of the alternatives to the OMP that were considered, details regarding the proposed conceptual mitigation plan,[4] and a discussion of methods for minimizing damage to the area. AR-18894 *et seq.* The application adopts and incorporates by reference the FAA's Environmental Impact Statement ("EIS") and its discussion of purpose and need, alternatives, and environmental consequences, and states that "[e]xtensive coordination has occurred with the [Corps], [the FAA], DuPage County Department of Economic Development and Planning (DEDP), OMP, Cook County, and others to plan for the required mitigation of [] resources." AR-18939-40.

The Corps, the FAA, and the Illinois Environmental Protection Agency ("IEPA") entered into an Interagency Coordination Agreement (an "ICA") for preparing the OMP EIS.

---

[3] It was eventually determined that approximately 97.1 acres instead of 92.7 would be affected. Plaintiffs' Statement, at ¶ 2.

[4] The City anticipated selecting the wetland developers and mitigation sites by no later than Spring of 2005, so that construction of the sites could begin concurrently with OMP site preparation activities. AR-18973.

Defendants' Statement, at ¶ 5. Under this ICA, the Corps and the FAA agreed to hold joint

Public Interest Review and Draft EIS Public Hearings and Public Notices in accordance with

both agencies' obligations under NEPA. Defendants' Statement, at ¶ 5. The ICA stated its

purpose as "to establish a framework under which the implementation of the Corps' [*sic*],

FAA's, and IEPA's respective responsibilities under [various laws including NEPA and the

CWA] associated with aviation projects may be coordinated, streamlined, and made more

efficient." AR-20563. The Corps's responsibilities were described:

> When and as requested by FAA, the Corps will attend and participate in O'Hare
> Modernization EIS meetings, particularly as related to project purpose and need,
> project alternatives, environmental consequences (with special reference to
> wetlands and other Waters of the U.S.), response to comments, and public hearing
> preparation.... The Corps will identify, pursue, and, in cooperation with FAA,
> implement opportunities to integrate its Public Interest Regulatory process with
> FAA's NEPA/EIS process, with the goal in mind of reaching a decision on the
> issuance of a Section 404 permit contemporaneously with FAA's decision on the
> O'Hare Modernization EIS, as contained in a Record of Decision. The Corps
> shall maintain its independent review responsibilities in accordance with Section
> 401 of the Clean Water [Act] ... [and] will retain fully all its rights and
> responsibilities to approve, disapprove, or enforce all permits and permit
> conditions required by the O'Hare Modernization Project.

AR-20564-66.

On January 14, 2005, the FAA issued a notice of availability of the Draft Environmental

Impact Statement ("the DEIS") and a notice of intent to hold public hearings on it, at which the

Corps would also be present. Defendants' Statement, at ¶ 6. At the same time, the Corps issued

a Joint Public Notice with IEPA of the City's Section 404 permit application. *Id*. One week

later, the Corps issued a Supplemental Public Notice, reporting that a mitigation review team had

reviewed the City's proposed mitigation sites and made a preliminary selection of six of them,

which it was planning to review more extensively.[5]  AR-20583.  The Supplemental Public Notice

also noted that in the Corps's preliminary review of the Section 404 permit application, it had

determined that an EIS was required and "is the FAA's DEIS for O'Hare Modernization.... The

FAA intends to host public hearings on the DEIS with the USACE and IEPA, who are

cooperating agencies on the DEIS."  Defendants' Statement, at ¶ 7; AR-20585.  All three of

these documents solicited public comment on the proposed actions.  AR-20572; 20576; 20582.[6]

During the public hearings on the FAA DEIS, conducted by the FAA, the Corps, and the IEPA

on February 22, 23, and 24, 2005, the FAA provided information on the progress of the DEIS as

well as the proposed mitigation for the Section 404 permit that included maps, photographs, and

information about the potential mitigation bank sites then under consideration.   Plaintiffs'

Statement, at ¶ 21; AR-21737; 21779-81.

The Corps assembled a Mitigation Review Team ("MRT") to review the City's proposed

mitigation bank sites.  Defendants' Statement, at ¶ 15.  The team included representatives from

---

[5] By letter of February 2, 2005, the Corps advised OMP of its preliminary acceptance of six sites: Neal Marsh, Stockbridge, Heron Creek (2 sites), Buffalo Creek, and Manhattan Creek. Plaintiffs' Statement, at ¶ 22.  The other six were rejected, and the Corps provided specific reasons for rejecting each site.  *Id*; *see also* Defendants' Statement, at ¶ 15.  The Corps recommended that the City consider revisiting the mitigation sites that had been presented to the Corps in 2003 by the City's consultants, and referred the City to a document where those were discussed.  AR-22668.

[6] Comments on the Corps's First Supplemental Public Notice included the following: the United States Fish and Wildlife Service ("FWS") commented that the applicant needed to provide "all pertinent site information such as site concepts, wetland delineations, areas proposed to be created, restored, and/or enhanced, proposed mitigation ratios, etc." for review. The Environmental Protection Agency's comments stated the following: "[i]n order to fully compensate for the impacts to wetlands and other WUS, the City needs to find additional mitigation sites.... We request that a permit not be issued for this project until the mitigation issue is resolved."  Plaintiffs' Statement, at ¶ 24.

the Corps's Chicago District, the IEPA, the federal Environmental Protection Agency (the

"EPA"), and the United States Fish and Wildlife Service ("FWS").  *Id*.  The MRT conducted

field evaluations of the potentially suitable sites.  Defendants' Statement, at ¶ 17.  As a result of

these visits, the team further narrowed the number of suitable sites to three.  *Id*.[7]  By letter of

April 6, 2005, the Corps advised the City that it was short of mitigation credits.  Plaintiffs'

Statement, at ¶ 25.  It said

> We will make the suggestion that you seriously consider engaging an
> organization that has expertise in real estate transactions, planning, and executing
> wetland restoration programs to assist you in developing a potentially acceptable
> set of projects, if you are still interested in trying to meet your proposed schedule.
> One such organization well known for their work in this area in the Chicago
> region is Corporation for Open Lands (CorLands), an affiliate of the Open Lands
> Project.... We have worked with CorLands on a number of programs over the past
> ten years, both having them as an administrator for a restoration program as well
> as a developer of a large wetland restoration program.... We have found them
> quite effective in identifying good projects and moving projects through from site
> identification and planning to full project execution.  I have discussed this
> concept with the other members of the MRT and they believe the concept to have
> merit, provided that appropriate safeguards, assurances, and oversight are built
> into such an effort.

AR-22709-10.  Finally, the Corps stated that the City could proceed in any fashion it chose to

develop an acceptable mitigation plan but that a final permit decision would not be made until

OMP's mitigation program was fully defined and balanced against anticipated project impacts.

Defendants' Statement, at ¶ 19.  Comments received by the Corps from other agencies and the

---

[7] The Stockbridge site was deemed unsuitable because the riparian corridor restoration
was not needed and the restoration would not offset the type of damage occurring at O'Hare.
Defendants' Statement, at ¶ 17.  The Buffalo Creek site was eliminated because it was part of a
pilot study for the Corps's Upper Des Plaines Phase II Project.  *Id*.  Plaintiff LAWR, the
developer of the Manhattan Creek site, withdrew that site from consideration due to difficulties
associated with a land annexation approval process.  *Id*.

public asked the Corps to consider other available[8] sites.  Plaintiffs' Statement, at ¶ 30.


       B.      The Environmental Impact Statement

      After receiving, considering, and addressing comments on the DEIS, the FAA released

the Final Environmental Impact Statement ("the FEIS") on July 27, 2005.[9]  Plaintiffs' Statement,

at ¶ 32; Defendants' Statement, at ¶ 12.  The Notice of Availability was published on August 5,

2005, with a public comment period to close on September 6, 2005.  *Id*.  The FAA issued a

Record of Decision ("ROD") approving the OMP on September 29, 2005.  Plaintiffs' Statement,

at ¶ 32; Defendants' Statement, at ¶ 12.

      After determining that the purpose and need for the OMP is to "[a]ddress the projected

needs of the Chicago region by reducing delays at O'Hare, and thereby enhancing capacity of the

National Airspace System[, and to] ensure that existing and future terminal facilities and

supporting infrastructure ... can efficiently accommodate airport users," the FAA considered a

broad range of alternatives to the City's proposed OMP, including fifteen alternatives in three

categories: (1) no action, (2) non-airfield alternatives,[10] and (3) airport development alternatives.

---

[8] The Corps points out in its filings that sites are not truly "available" to be used for mitigation until it has deemed them acceptable.  The sites referenced in these comments had not been accepted.

[9] The FEIS is a voluminous and detailed document.  It is organized into eight chapters, plus an Executive Summary and Appendices A-N.  The excerpted version filed with the court easily surpasses 1,000 pages.

[10] The non-airfield alternatives included (1) use of other modes of transportation and/or communication; (2) use of other airports; (3) congestion management; (4) airspace improvements; and (5) new air traffic control and navigation technologies.  AR-10618-20.

AR-10616.[11] The FAA also considered a "blended alternative," which it created as a combination of elements of non-airfield alternatives along with limited development at O'Hare. AR-10654. This included a limited airfield improvement alternative, other modes of transportation and communication, use of other airports, new air traffic control and navigation technologies, and congestion management. *Id*.

The FAA conducted a two-tiered reasonableness screening process for evaluation of potential project alternatives to determine which would be retained for detailed consideration (including environmental impact analysis). It first determined which of the alternatives might meet the purpose and need of the OMP and then evaluated those that potentially could satisfy the purpose and need in terms of their feasibility and their prudence to determine which of them could be reasonable. Defendants' Statement, at ¶ 9; AR-10615-16; 10657-60. In that second tier, the FAA examined factors such as environmental and social factors, operational efficiency factors, economic factors, and national policy factors. *Id*. The FAA stated that in applying its second tier of review, it was keeping the CWA "practicable alternatives" standard in mind. AR-10657-58. Alternatives that passed both of the first two tiers were retained for detailed consideration (including environmental impact analysis). AR-10615-16.

The FAA determined that the non-airfield alternatives on their own did not have the potential to meet the purpose and need of the OMP. AR-10632-35; 10647-52. While the blended alternative was created and retained for secondary consideration, the FAA ultimately

---

[11] As examples of the broad range of alternatives that were included in the analysis, the FAA considered the potential for advances in telecommunications to alleviate the demand for air travel as well as the potential for new air traffic control and navigation technologies to enhance the capabilities and capacity of the existing infrastructure. AR-10618-19.

eliminated it too because it consisted of several speculative technological and infrastructure developments combined with a fundamental restructuring of current marketplace aviation demand, which is not within the control of the City or the FAA to implement. Plaintiffs' Statement, at ¶ 63; AR-10663-64. Additionally, the FAA concluded that the blended alternative would yield the least delay reduction, would not serve the forecast demand at O'Hare, and would have environmental impacts substantially equal to the other on-site alternatives. *Id*. After the elimination of the non-airfield alternatives and the blended alternative, as well as some of the airport development alternatives, four development alternatives were retained for detailed consideration: Alternatives C (the OMP), D, and G, in addition to a no-action alternative,[12] Alternative A. AR-10666.

The FEIS includes more than 500 pages of scientific studies, predictions, and analyses of the environmental consequences of the OMP and the other alternatives that were retained for detailed consideration, including 16 pages specifically devoted to wetlands, plus a 17-page wetlands appendix. AR-11528 - AR-11543; N-40 - N-56. This section notes and applies the CWA's practicable alternatives standard and states that the Corps was extensively consulted in the preparation of the FEIS. *Id*. The O'Hare wetlands are described as being mostly hydrologically isolated, providing few beneficial wetland functions and values, and as having been adversely affected by human activities. AR-11532. Among the three on-site alternatives, Alternatives C and G would result in the filling of 154.2 acres of wetlands and Waters of the United States, while Alternative D would have temporarily spared 7.65 of those acres. AR-

---

[12] The NEPA regulations require that a no-action alternative be retained for detailed analysis for comparison purposes. 40 C.F.R. § 1502.14.

11535. The 7.65 acres would have been expected to dry up over time anyhow, however, so the three on-site alternatives were ultimately determined to have identical impacts to wetlands. AR-11535.

A section was included in the FEIS regarding mitigation for damage to wetlands. AR-10824 *et seq.* This section described the City's then-current conceptual mitigation plan, which had been revised since the filing of the City's Section 404 permit application but did not yet include any information about the possibility of using an in-lieu fee arrangement. *Id.* It said that "[m]itigation will be described in the USACE Section 404 Individual Permit when issued. Adequate wetland mitigation is available." AR-10828.

It is evident that the Corps participated in the preparation of the FEIS. The FEIS explicitly stated its intention to satisfy the requirements of the CWA: "Because the proposed action involved the application for a permit from the U.S. Army Corps of Engineers to fill Waters of the U.S., issuance of the 401 Water Quality Certification from the Illinois EPA, and required FAA findings regarding wetlands and floodplains, the FAA must also comply with the alternative analysis of the Clean Water Act, requiring a finding that no practicable alternative exists that would avoid or further minimize impacts to the resources at issue." AR-10657. Additionally, it noted that the Corps "is reviewing and processing a Section 404 permit application ... [and] will use the information developed during this EIS process to reach decisions on project alternatives." AR-10824. In the Executive Summary, the FEIS states, "The FAA acknowledges and appreciates the significant role played by the following agencies in this EIS process by serving as cooperating agencies: ... United States Army Corps of Engineers." AR-11005. *See also* AR-10504; 10804.

14

C.     The In-Lieu Fee Arrangement

By September 12, 2005, the Corps issued a Second Supplemental Public Notice in which it provided the public with information on the City's revised mitigation proposal, including the in-lieu fee.  Plaintiffs' Statement, at ¶ 33; Defendants' Statement, at ¶ 26.  This Notice provided a description of the new mitigation proposal that the City had submitted to the Corps. Defendants' Statement, at ¶ 28.  It solicited public comment during a 30-day period (which was later extended to October 24, 2005), Defendants' Statement, at ¶ 26, and said that comments would be used in the preparation of an Environmental Assessment and/or Environmental Impact Statement pursuant to NEPA.  Defendants' Statement, at ¶ 27.  The Notice said that "[a] Final Environmental Impact Statement was published on July 28, 2005 and is available at http://www.agl.faa.gov/OMP/FEIS.htm."  Defendants' Statement, at ¶ 27.  The Notice described the City's proposal as involving purchasing credits from the new Lily Cache Creek Wetland Mitigation Bank ("Lily Cache") and establishing an in-lieu fee program whereby the City would pay a mitigation fee to the non-profit corporation, CorLands.  *Id*.  The Notice indicated that "[a] formal In-Lieu-Fee agreement would be established between [another] MRT and CorLands for the establishment and operation of multiple mitigation sites" and listed the potential contents of such an agreement.[13]  *Id*. (citing AR-20592); Defendants' Statement, at ¶ 29.  The Notice also

---

[13] These potential contents were (1) a description of the sponsor's experience and qualifications with respect to providing compensatory mitigation; (2) potential site locations, baseline conditions at the sites, and general plans that indicate the type of wetland compensation to be provided (e.g., wetland type, restoration or other activity, proposed time line, etc.); (3) geographic service area; (4) accounting procedures; (5) methods for determining fees and credits; (6) a schedule for conducting the activities that will provide compensatory mitigation or a requirement that projects will be started within a specified time after impacts occur; (7)

described the role that a new MRT (the Corps, the FAA, the EPA, the IEPA, and the FWS) would play in reviewing and approving appropriate mitigation projects from the mitigation proposals that CorLands would make. *Id.*

The comments that the Corps received in response to the Second Supplemental Public Notice were mixed. The Sierra Club commented, "We were surprised and dismayed at the recent zigzag taken by the Corps and the [OMP] regarding the 153 acres of destroyed wetlands planned for the airport expansion.... We are not sure what went on behind the scenes that led to this flawed solution." Plaintiffs' Statement, at ¶ 34. Many comments (including some from plaintiffs) emphasized their opinion that an impact of 97.1 acres was too large for an in-lieu fee, Plaintiffs' Statement, at ¶ 37, and the Headquarters of the Corps advised the Chicago Corps District that use of an in-lieu fee for the OMP's impacts would be unusual. Plaintiffs' Statement, at ¶ 36. On the other hand, the FWS wrote a letter saying that "we recognize the significance of this important transportation improvement project and believe an in-lieu fee approach can be developed with appropriate controls to ensure that adequate mitigation is identified and implemented within a reasonable timeframe." Defendants' Response to Plaintiffs' Statement, at ¶ 35. USEPA expressed the need to establish a "comprehensive mitigation plan," and an "interagency agreement that outlines an interagency approval process that is consistent with the federal banking guidance." *Id.* It noted that "[t]he approach outlined in the public notice is a good start to the development of such a plan." *Id.*

---

performance standards for determining ecological success of mitigation sites; (8) reporting protocols and monitoring plans; (9) financial, technical, and legal provisions for long-term management and maintenance of the sites (e.g., a trust); and (11) a provision that clearly states that the legal responsibility for ensuring mitigation terms are fully satisfied rests with CorLands. Defendants' Statement, at ¶ 29.

16

On December 19, 2005, the Corps issued Permit 200301000 under Section 404 of the CWA, 33 U.S.C. § 1344, authorizing the City to fill 97.1 acres of wetlands under the jurisdiction of the CWA. Plaintiffs' Statement, at ¶ 2. As mitigation, the permit requires the City to (1) pay a flat fee of $26,466,429.00 to CorLands as an in-lieu fee provider responsible for 280.14 acres of off-site mitigation, and (2) purchase 62.26 acres of mitigation credits from Lily Cache for $4,544,980.00. *Id*. The permit also describes, but imposes no requirements for, the mitigation for impacts to the approximately 56 acres of wetlands and streams that will be filled but are not under federal jurisdiction. *Id*.

In conjunction with the issuance of the permit, the Corps prepared a Permit Evaluation and Decision Document, which contained an Environmental Assessment (an "EA") and a finding of no significant impact (a "FONSI") pursuant to NEPA. Plaintiffs' Statement, at ¶¶ 3, 66. Plaintiffs' Statement, at ¶ 66. This EA referenced the FAA's FEIS and quoted directly from several portions of it. AR-20601 *et seq*. The Corps stated that it was a cooperating agency in the review of the DEIS, and that it "agreed to adopt and incorporate the [FEIS] into our decision making process with respect to key issues such as the [Section] 404(b)(1) guidelines, purpose and need, alternatives analysis, [and] public interest review factors." AR-20602; *see also* Plaintiffs' Statement, at ¶ 60. The Corps summarized and responded to the concerns that were raised regarding the proposed in-lieu fee in the comments to its Second Supplemental Public Notice, but ultimately adopted the in-lieu fee and the purchase of credits from Lily Cache as the required mitigation for the OMP. AR-20607-13; 20618-20. The Corps also reviewed the potential alternatives to the project as discussed in the FEIS and concluded that there were no practicable alternatives to the OMP. AR-20628.

17

The in-lieu fee arrangement is governed by no less than four separate but related documents. First, there is an August 26, 2005 agreement between the City and CorLands entitled "Agreement Concerning In-Lieu Mitigation Fee for the Chicago-O'Hare International Airport O'Hare Modernization Program Between City of Chicago and Corporation for Open Lands." AR-21244. Second, there is the "O'Hare Modernization Program Prospectus for Providing Wetland Mitigation," prepared by CorLands and dated August 31, 2005. AR-20659; 21108. Third, there is an Interagency Coordination Agreement (an "ICA") between CorLands and the Corps, the FAA, the FWS, the EPA, and IEPA (the MRT), executed on December 13, 2005, which establishes procedures to be followed in the administration of the O'Hare Modernization Mitigation Account (the "OMMA") (the fund for the OMP in-lieu fee arrangement). AR-20633. This ICA attaches the agreement and the prospectus as appendices. AR-20635-36; 20644-74. And finally, the Section 404 permit issued by the Corps requires that the City "adhere to all requirements and obligations as set forth in the [agreement] and [the ICA]." AR-20677. The parties agree that the the in-lieu fee arrangement was not approved as a mitigation bank. Plaintiffs' Statement, at ¶ 54. It lacks the detailed site-specific mitigation plans required of a mitigation bank. *Id*.

Through the interaction of these documents, CorLands and the MRT are bound to detailed standards for the execution of the in-lieu fee arrangement and the management of the OMMA. The agreement between the City and CorLands says that CorLands will use the fee to (1) identify and assess mitigation opportunities in the Des Plaines River watershed within the Chicago District of the Corps for the purpose of generating mitigation credits; (2) implement practical plans to protect, purchase, enhance, restore, and monitor the projects; (3) pay costs and

18

expenses of administering the funds in the OMMA; and (4) establish financial, technical, and

legal mechanisms to work towards the long term success of the projects in consultation with the

Corps. AR-21245. Under this agreement, CorLands obtains significant, immediate financial

benefits which are not applied to actual wetland mitigation. The agreement specifically includes

the following:

- A provision that the City will pay CorLands an in-lieu fee of $25,947,479.00 and an administrative fee of $518,950.00;
- A provision that CorLands may leverage the in-lieu fee with funds from other sources to further enhance the mitigation projects;
- A provision that CorLands will place the in-lieu fee with a financial institution and use the earnings in a manner consistent with the agreement;[14]
- A requirement that Corlands provide financial reports for the OMMA account to each member of the MRT;[15]
- A provision that all books and records in connection with the in-lieu credits will be open to inspection by the City;
- An agreement by CorLands to be solely responsible for providing the City with 280.14 credits, and for satisfying the mitigation requirements of the OMP permit with respect to those credits; and
- An acknowledgement by CorLands that the Corps may use the agreement to document CorLands' commitment to furnish the in-lieu credits to the City.

21244-21257.

CorLands' prospectus describes the overall goal of the OMMA and includes the

following initial provisions:

_____

[14] The in-lieu fee is held by CorLands, rather than an independent, bonded escrow agent. Plaintiffs' Statement, at ¶ 52.

[15] CorLands must provide to each member of the MRT and the City an annual financial report for the OMMA. Defendants' Response to Plaintiffs' Statement, at ¶ 52. Furthermore, CorLands must provide to the MRT and the City as well as the public an annual report showing expenditures on a project-by-project basis for prior years and the report year, a description and status of work conducted on each Mitigation Project during the report year, and any additional information required in individual project plans. *Id.* Furthermore, in the Prospectus, CorLands said that it would secure an independent audit of the OMMA every year and provide that audit report to the City and the Corps along with its annual report. AR-21108-09.

- CorLands is able to purchase mitigation credits from approved and permitted wetland mitigation banks within the watershed;
- An individual project prospectus will be submitted for each project proposed for funding, which will include specific information addressing site selection criteria, technical feasibility, method of credit generation, buffers, performance criteria, goals and objectives, baseline conditions, management, monitoring and reporting protocols, contingency plans and responsibilities, financial assurances, compensation ratios, and long-term protection and management; and
- All projects considered for funding under the OMMA will be reviewed by the MRT, with the Corps having final responsibility for the approval of projects.

AR-21108-12.

The Inter-Agency Coordination Agreement includes the following:

- A requirement that the mitigation be established in accordance with applicable authorities (including the 1997 Interagency Coordination Agreement on Wetland Mitigation Banking within the Regulatory Boundaries of the Chicago District, Corps of Engineers);
- Eleven site selection criteria;
- Information that must be included in each individual site prospectus;
- Ten items that must be included in each project proposal prepared by CorLands;
- Nine items that must be included in each site development plan;
- A provision that the Corps retains final authority for the final approval of projects;
- Performance standards;
- Requirements for the MRT to conduct a technical review, to conduct a site visit if warranted, to issue a public notice identifying each potential project and seeking comments, to review long term management strategies, and to generally comply with the 1995 Federal Guidance on Mitigation Banking; and
- A provision that "CorLands will be fully accountable for satisfying the mitigation requirements defined by their agreement with the City of Chicago and this agreement."

AR-20633-41.

III.    Standing

To seek judicial review of the Corps's permit decision under NEPA and the CWA,

plaintiffs must show that they have been "adversely affected or aggrieved by agency action

20

within the meaning of the relevant statute." *Am. Fed'n of Gov't Employees, Local 2119* v. *Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) (citing Administrative Procedure Act, 5 U.S.C. § 702). This requires establishing both constitutional and prudential standing; both an "injury in fact" and an interest falling within the "zone of interests" protected by the relevant statutes. *Id*. (citing *Ass'n of Data Processing Serv. Orgs.* v. *Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)). The party invoking federal jurisdiction bears the burden to prove standing. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992).

Constitutional standing requires three things. First, the plaintiff must have suffered an "injury in fact," meaning an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). Second, that injury in fact must have been caused by the conduct of the defendant that the plaintiff is complaining about; "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id*. "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*.

Prudential standing is an additional limitation on access to the courts, designed to determine whether "a particular plaintiff should be heard to complain of a particular agency action." *Cohen*, 171 F.3d at 469 (citing *Clarke* v. *Securities Indus. Ass'n*, 479 U.S. 388, 399-400, 107 S. Ct. 750, 93 L. Ed. 2d 757 (1987)). It requires a potential plaintiff to "establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Cohen*, 171 F.3d at

21

468 (quoting *Lujan* v. *National Wildlife Fed'n*, 497 U.S. 871, 883, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)). The Supreme Court has suggested that lower courts first look at what interests are arguably to be protected by the statute at issue, and then inquire whether the plaintiff's interests are among them. *National Credit Union Admin.* v. *First Nat. Bank & Trust Co.*, 522 U.S. 479, 492, 118 S. Ct. 927, 935, 140 L. Ed. 2d 1 (1998). For a plaintiff's interests to be within the "zone," there does not have to be an "indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 492 (citations omitted). But "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399-400.

Furthermore, the plaintiffs must establish that they have standing to bring each of their claims. *Cohen*, 171 F.3d at 463, 475 (holding that plaintiffs had standing to bring a claim under the Arsenal Act and could pursue it, but that they did not have standing under other statutes and therefore could not pursue claims that the government violated those statutes). As long as at least one plaintiff can show this, the case can go forward. *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 126 S. Ct. 1297, 1303 n.2, 164 L. Ed. 2d 156 (2006) (noting that it is not necessary to determine whether all named plaintiffs have standing because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement"); *Cetacean Community* v. *Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

A.     Plaintiffs' alleged injuries

Plaintiffs allege various theories regarding their injuries, including (1) physical injury to the wetlands in which they have an ownership interest; (2) injury to their scientific and educational interests in wetlands in the Chicago region; (3) injury to their economic interests in that they lost money developing proposals for mitigation that were not chosen; (4) injury to their informational and procedural interests under NEPA; and (5) injury to their employees' interests in enjoying wetlands that would be affected by the OMP.  While the Corps denies the viability of each of these standing theories, it focuses its opposition to plaintiffs' standing on the elements of causation and redressability, arguing that any injury incurred by plaintiffs was not caused by its permit decision and is not redressable by this court in this case.  Defendants' Br., at 24.

Plaintiffs allege that their injuries are caused by (1) the Corps's failure to comply with NEPA by preparing an EA and a mitigated FONSI instead of an EIS; (2) the Corps's failure to comply with the procedural requirements for an EA under NEPA; (3) the Corps's failure to independently assess the environmental impacts of the OMP under NEPA; (4) the Corps's failure to provide sufficient information about mitigation under NEPA; (5) the Corps's failure to consider all practicable alternatives to the OMP under the CWA; and (6) the Corps's violation of the CWA through its approval of the in-lieu fee arrangement.  They do not specify which injuries were caused by which actions, so the court has considered all possible matches.  Based on this review, the plaintiffs do have standing to bring both their NEPA and their CWA claims.

1.     Physical injury to plaintiffs' mitigation banks

Three of the plaintiffs, WRI, LAWR, and WMI, have interests in wetland mitigation

banks in the Des Plaines River watershed near O'Hare. They allege that allowing the OMP to fill those wetlands would directly and physically affect their banks.

Plaintiff WRI owns and manages three wetland mitigation banks, including two that are located within its Des Plaines River Wetland Demonstration Project ("the Demonstration Project"), a "living laboratory" established in the Lake County Forest Preserve District to provide a place to study wetlands. Hey Aff., at ¶¶ 3, 4, 5, 7. The Demonstration Project is located within the Des Plaines River Trail and Greenway, an interconnected system of parks and natural preserves situated along the length of the Des Plaines River. Hey Aff., at ¶ 11. The Trail and Greenway connects to the Cook County Des Plaines Trail System, which runs alongside O'Hare airport. *Id*. The Demonstration Project is 35 miles upstream of the O'Hare wetlands. Hey Aff., at ¶ 23. Hey argues that the alteration of hydrology that would occur with filling the O'Hare wetlands could negatively affect the aquatic habitat at the Demonstration Project by impacting the needs of organisms such as fish that move both up- and downstream, or reduce available habitat for birds that migrate around the area and use the Demonstration Project, which would in turn affect the health of the Demonstration Project wetlands. Hey Aff., at ¶¶ 24, 25, 26.

Plaintiff LAWR has constructed nine wetland mitigation projects in the Des Plaines River watershed, at least three of which are banks that are downstream of O'Hare. Urban Aff., at ¶ 10; Ryan Aff., at ¶¶ 3, 27. According to Urban, "absent appropriate mitigation for the 153 acres of wetlands and stream destruction at O'Hare ... the wetlands functions at these sites could be diminished." Urban Aff., at ¶ 10. Urban opines that if the O'Hare wetland impacts are not properly mitigated adverse consequences will befall wetlands in the Des Plaines River

watershed, which has the potential to damage LAWR's mitigation sites. Urban Aff., at ¶ 12.

LAWR owns 60% of plaintiff WMI. WMI has developed three wetland mitigation banks in the Des Plaines River watershed. Ryan Aff., at ¶ 4. These include the Lily Cache wetland bank, which is to be used for mitigation at O'Hare. Ryan Aff., at ¶ 8g.

2.     Competitive injury

Plaintiff WRI invested money and other resources to develop several wetland sites to be potential mitigation options for OMP. Hey Aff., at ¶ 27. One of these was the Neal Marsh site, which the City selected and proposed in its Section 404 permit application. AR-18972; Hey Aff., at ¶ 27. WRI also submitted three other potential mitigation sites, including Indian Creek, Heron Creek, and Buffalo Creek. AR-18972. LAWR too applied its own resources to develop specific wetland mitigation sites as potential wetland mitigation options for OMP. Ryan Aff., at ¶ 19. The work entailed planning, negotiations with land owners at the sites, attending meetings with the public agencies involved, and preparing materials to submit to the City. Ryan Aff., at ¶ 19. LAWR proposed several potential mitigation sites to the City: Cedar Creek, Heron Creek Forest Preserve, Lily Cache, Long View Meadow, Manhattan Creek, Reed Turner Nature Preserve and Stockbridge. Ryan Aff., at ¶ 19; AR-18972. Of the twelve initial proposals that the City received in response to its April 23, 2004 RFP, ten were from either LAWR or WRI. AR-23394; Defendants' Br. At 12.

The MRT (comprised of representatives from the Corps, the EPA, the FWS, and the IEPA) preliminarily accepted five of the plaintiffs' proposed mitigation sites in February of 2005. AR-22666. The MRT selected Neal Marsh, Stockbridge, Heron Creek, Buffalo Creek,

25

and Manhattan Creek. *Id*. at 22666-67. The other five were rejected at that time. *Id*. Two of the initially selected sites were later rejected by the MRT, and LAWR withdrew Manhattan Creek, leaving Neal Marsh and Heron Creek. AR-22709. The Corps noted that these sites left the OMP "seriously short of adequate compensatory mitigation" and suggested that it consider working with CorLands to develop an acceptable set of projects. AR-22709. Ultimately, the Lily Cache mitigation bank, which was initially rejected, was revised, chosen and approved by the Corps along with the CorLands in-lieu fee, but Neal Marsh and Heron Creek were not. AR-20677.

B.      Standing under NEPA

The potential physical injury to plaintiffs' mitigation banks is sufficient to support their claims under NEPA and their claim that the Corps failed to require the City to show that there were no practicable alternatives to the OMP. These are allegations that the Corps violated the plaintiffs' procedural rights, for which the standing requirements of imminence of injury and redressability are relaxed. *Lujan*, 504 U.S. at 573 n.7. An individual may enforce procedural rights granted to them by statutes "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id*. at 573 n.8. For example, courts have found the existence of standing to enforce procedural rights in cases where, for example, citizens who lived near bodies of water challenged the CWA's failure to provide a public hearing on a permit, despite their inability to show the immediacy of any injury from activities allowed under that permit, *Texas Independent Producers & Royalty Owners Ass'n* v. *Environmental Protection Agency*, 410 F.3d 964, 976-77 ("*TIPRO*"); farmers who

feared a potential reduction in their water supply alleged that federal agencies violated NEPA by providing an inadequate EIS for a proposed water management plan, even though the farmers could not prove imminent injury or that an adequate EIS would have led to a different outcome, *Laub* v. *U.S. Dep't of the Interior*, 342 F.3d 1080, 1086-87 (9th Cir. 2003); and where a plaintiff alleged that the Bureau of Land Management violated NEPA by providing an inadequate EA for a construction project that he feared would exacerbate his respiratory problems, even though he could not prove that it would do so. *Hall* v. *Norton*, 266 F.3d 969, 976-77 (9th Cir. 2001).

NEPA is a procedural statute. Its policy goals of protecting and promoting environmental quality are realized through a set of actions forcing procedures that require that agencies take a "hard look" at environmental consequences and provide the public with relevant environmental information. *Robertson* v. *Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989). Allegations that the Corps's EA was insufficient and that the Corps failed to properly assess alternatives are procedural rights.

Plaintiffs have underlying concrete interests in the health and viability of their mitigation projects that support their ability to allege these procedural rights: they are alleging that filling the wetlands at O'Hare may have an adverse effect on their mitigation banks downstream (and perhaps upstream as well).[16] Wetlands are inherently interconnected, and in this case, the proposed action is major and within the same river watershed as the plaintiffs' property.

---

[16] The Ninth Circuit explained in *Ashley Creek Phosphate Co.* v. *Norton* that "[f]or claims brought under NEPA, we have described this 'concrete interest' test as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact.... Accordingly, plaintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest." 420 F.3d at 938 (internal quotation marks and citations omitted).

Therefore, the fact that plaintiffs' injuries are potential, but not immediate or inevitable, does not defeat their standing under NEPA. Defendants' quote from *TIPRO*, saying that a "plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it," *TIPRO*, 410 F.3d 964, 972, is not persuasive. That statement was not made in the context of the court's discussion of procedural rights. The court later said that "even though the [plaintiffs] cannot establish the immediacy of an injury from construction activities operating under the General Permit, the [plaintiffs] nonetheless ha[ve] standing to challenge the EPA's [alleged procedural violations]." 410 F.3d at 977.

Defendants do not challenge plaintiffs' prudential standing under NEPA, and plaintiffs address it only in a footnote. Pls.' Reply, at 9 n.10. Nevertheless, it is clear that their alleged injuries to the physical well-being of their mitigation banks are within NEPA's zone of interests. NEPA's goal is to protect the environment, *Robertson*, 490 U.S. at 350, and plaintiffs are claiming potential damage to the environment. Plaintiffs have both constitutional and prudential standing to bring their NEPA claims.

C.      Standing under the CWA

Plaintiffs' claim that the Corps failed to require the City to clearly demonstrate that no practicable alternatives to the OMP existed, as it was required to do under the CWA regulations, is again a claim of violation of their procedural rights. For the reasons discussed above regarding NEPA standing, plaintiffs have standing to bring this claim. Their challenge to the Corps's approval of the in-lieu fee arrangement, on the other hand, attacks the substance of the permit and not the Corps's compliance with the CWA procedures. *See TIPRO*, 410 F.3d 971-77.

28

The potential injuries to the plaintiffs' mitigation banks are insufficient to support standing for this claim, because they lack the imminence that is required outside of the procedural rights realm. Nevertheless, plaintiffs have still shown standing to challenge the substance of the CWA permit through their allegations of economic and competitive injuries. An allegation of competitive injury due to an agency decision can be sufficient to support a third party's standing, assuming all other standing requirements are met. *Simmons* v. *Interstate Commerce Commission*, 900 F.2d 1023, 1026 (7th Cir. 1990).

The Corps assumes that the plaintiffs can allege an injury to their competitive interests, and focuses its challenge on their inability to show causation and redressability. Defendants' Br., at 24. Defendants state that "Chicago chose, for reasons of its own, not to pursue additional credits at other sites identified by its consultants, notwithstanding suggestions by the [C]orps that it do so." Defendants' Br., at 25. They further argue that a favorable decision from this court will not necessarily redress plaintiffs' injuries, because if the permit is found unlawful, the matter will be remanded to the Corps for a new permit proceeding and the City will be required to present a new package of mitigation that may or may not include plaintiffs' proposals. *Id*. at 25-26. They liken this case to *Simmons*, where the court held that the plaintiffs lacked standing to challenge an agency's regulation of a third party because although the court could vacate the agency's decision, there was no evidence that the regulated third party would take actions that were necessary to address the plaintiffs' injuries (and in fact the evidence indicated that the third party would probably not take that action). 900 F.2d at 1026.

An injury in fact must be "fairly traceable" to the challenged agency action and likely to be redressed by a decision of the court in plaintiff's favor. *TIPRO*, 410 F.3d 964, 972 (7th Cir.

2005). The plaintiff must link its alleged injury to the conduct at issue, such that a remedy of

that conduct will provide a remedy of the plaintiff's grievance. *Id*. In cases such as this one,

where the plaintiffs' asserted injury "arises from the government's allegedly unlawful regulation

(or lack of regulation) of *someone else*, much more is needed" to establish causation and

redressability. *Id*. at 971 (quoting *Lujan*, 504 U.S. at 562) (emphasis in original). In such

situations, causation and redressability ordinarily hinge on the response of the regulated third

party and, thus, plaintiffs must adduce facts showing that that response was caused by the

agency's action. *Id*.

Speculation regarding causation and redressability is insufficient to confer standing on a

plaintiff. *Wisconsin* v. *FERC*, 192 F.3d 642, 646 (7th Cir. 1999). On the other hand, plaintiffs

need not show that a favorable decision from the court is sure to redress their injuries; a

probability is enough to satisfy Article III's requirements. *Cohen*, 171 F.3d at 467 (holding that

a plaintiff challenging the award of a government contract had standing because if the court were

to issue a favorable decision, it "[stood] a good chance of gaining some of [the] work"). The

*Cohen* court distinguished its holding from cases where "redressability is not satisfied where

relief depends on the voluntary actions of a third party not joined in the suit," such as *Burton* v.

*Central Interstate Low-Level Radioactive Waste Compact Comm'n*, 23 F.3d 208, 209-10 (8th Cir.

1994). 171 F.3d at 467.

This case is more similar to those involving agency regulation of third parties where

courts have found standing than it is to cases where courts have denied standing. Courts deny

standing where there is no evidence that reversing the agency's decision would address the

plaintiffs' grievances. For example, in *Burton*, 23 F.3d at 210, the plaintiffs were challenging

the government's imposition of taxes on utility companies, arguing that their utility bills increased as a result of the taxes. The court found a lack of redressability because there was no evidence that the utilities would reduce their rates if the taxes were dropped. *Id*. Similarly, in *Simmons* v. *Interstate Commerce Commission*, a company that owned a stretch of railroad had not maintained it in years and sought permission from a federal agency to abandon it. 900 F.2d at 1024. The plaintiffs challenged the allowance, arguing that they would be competitively disadvantaged by not having access to a rail line, but the court said that even if the abandonment decision were denied, there was no evidence in the record or even any allegation that the company would fix the damage. *Id*. at 1026. In fact, it appears from the discussion in the case that the company was very unlikely to fix the damage, since the rail line had been idle and damaged for years before the proceeding. *Id*. at 1024-1026. Finally, although not involving a third party, the plaintiff in *Ash Creek Mining Co.* v. *Lujan*, 969 F.2d 868, 871 (10th Cir. 1992), challenged the government's decision to exchange a tract of land that the plaintiff would have liked to purchase through a competitive leasing program. The court found that the plaintiff lacked standing because the court could not require the government to offer the competitive leasing program, and even if it could, there was no showing of a likelihood that the plaintiff would win. *Id*. at 872, 874.

This case is distinguishable from *Burton, Simmons*, and *Ash Creek*, because although there is a third party involved (the City), there is substantial evidence here that if the court reversed the Corps's permit decision on the basis that approving the in-lieu fee was arbitrary and capricious and that the Corps should have required the City to pursue mitigation bank options, the plaintiffs' economic and competitive injuries would be redressed. Defendants' argument that

the City chose the in-lieu fee "for reasons of its own" is disingenuous. In the City's application

for a Section 404 permit, it proposed a long list of potential mitigation bank sites, and the vast

majority of those were submitted by plaintiffs. AR-18972. Over the course of the Corps's

review, it rejected almost all of these sites, and ultimately informed the City that it was

"seriously short of adequate compensatory mitigation" and suggested that the City consider

using an in-lieu fee. AR-22709. Until that time, the City appears to have been intending to

fulfill its mitigation obligations by purchasing mitigation bank credits. And due to the

dominance of plaintiffs in the mitigation banking industry in the Des Plaines River watershed,

the City was highly likely to select one of plaintiffs' sites. Furthermore, the regulations and

guidance governing mitigation favor mitigation banks over in-lieu fees, further showing that the

City would have reason to choose plaintiffs' mitigation banking proposals if the OMP permit

were to be remanded to the Corps. 65 Fed. Reg. 66914, at § III(B)(2).

Because of this set of facts, this case is more like *Cohen*, where the Seventh Circuit ruled

that the plaintiffs did have standing. In *Cohen*, the plaintiffs challenged the Army's decision to

award a production contract to a private bidder without allowing the plaintiffs, employees of a

government-owned arsenal, to bid. 171 F.3d at 463-64. Plaintiffs alleged that this was in

violation of the Arsenal Act, 10 U.S.C. § 4532, which required the Army to have needed supplies

made in federal arsenals as long as the arsenals could make them on an economical basis. *Id*. at

473. Therefore, the causation and redressability requirements were satisfied, because if the

plaintiffs were correct, on remand the Army would be required to allow them to bid on the

project. *Id*. At 466-67.

With regard to prudential standing, plaintiffs' CWA claims are only slightly more

32

complicated. The purpose of the CWA, as stated by Congress, is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251; *South Florida Water Management Dist.* v. *Miccosukee Tribe of Indians,* 541 U.S. 95, 102, 124 S. Ct. 1537, 1541, 158 L. Ed. 2d 264 (2004). The economic interests of mitigation banks are very closely aligned with this objective, and are therefore at least "arguably" within the zone of interests to be protected by the CWA. This is not a case where the plaintiffs are asserting "purely" economic interests, as was the case in *Ashley Creek Phosphate Co.* v. *Norton*, 420 F.3d 934, 940 (9th Cir. 2005), where the plaintiff invoked NEPA to challenge an EIS on the basis of their loss of an opportunity to sell phosphate. The economic interests of mitigation banks are necessarily related to the underlying objective of the banks, which is the same as that of the CWA: to restore and maintain the waters of the United States. Plaintiffs have both constitutional and prudential standing to bring their CWA claims.[17]

IV.     Statutory Background

      A.     National Environmental Policy Act

      NEPA promotes its purpose of protecting the environment by requiring federal agencies to take a "hard look" at the environmental effects of their proposals before going forward with them: to look before they leap. 42 U.S.C. §§ 4321, 4331-32; *Robertson* v. *Methow Valley*

---

      [17] Because the court has concluded that plaintiffs have standing based on their procedural injuries, potential physical injuries to their mitigation banks, and their competitive injuries, it is not necessary to consider their other alleged bases for standing, such as injury to their vocational and scientific interests or injury to their employees' interests in enjoying certain wetlands. Additionally, because the court has determined that plaintiffs WRI, LAWR, and WMI have standing, it is not necessary to determine if plaintiff NMBA has associational standing or if it has any other independent bases for standing. *Rumsfeld,* 126 S. Ct. at 1303 n.2.

*Citizens Council*, 490 U.S. 332, 347, 109 S. Ct. 1835, 1844-45, 104 L. Ed. 2d 351 (1989).

NEPA is a procedural statute, in that it does not require agencies to make the decision that is best

for the environment, but only prescribes the process that they must follow in making their

decisions. *Highway J Citizens Group* v. *Mineta*, 349 F.3d 938, 953 (7th Cir. 2003) (citing

*Robertson*, 490 U.S. at 349). By forcing agencies to pay attention to the environmental

consequences of their potential actions, NEPA ensures that important effects will not be

overlooked only to be discovered when it is too late. *Marsh* v. *Oregon Natural Resources*

*Council*, 490 U.S. 360, 371, 109 S. Ct. 1851, 1858, 104 L. Ed. 2d 377 (1989) (citation omitted).

NEPA also guarantees that the public will be informed of potential agency decisions in time to

meaningfully participate in the decisionmaking process. *Id.*

NEPA created the Council on Environmental Quality (the "CEQ") and vested it with the

power to develop and provide advice and recommendations to the executive branch on

environmental matters. 42 U.S.C. § 4342. The CEQ promulgated regulations implementing the

statute that are binding on all federal agencies. 40 C.F.R. § 1507.1. Additionally, the Corps has

promulgated its own regulations providing guidance for the implementation of NEPA. 33 C.F.R.

§ 230 *et seq.*; *Simmons* v. *Army Corps of Eng'rs*, 1996 WL 1323088 (S.D. Ill. Dec. 18, 1996).

One process required under NEPA is that all federal agencies must prepare an EIS for

"major Federal actions significantly affecting the quality of the human environment."[18]  42

---

[18] An EIS must address the following: (1) the environmental impact of the proposed
action; (2) any adverse environmental effects which cannot be avoided should the proposal be
implemented; (3) alternatives to the proposed action; (4) the relationship between local short-
term uses of man's environment and the maintenance and enhancement of long-term
productivity; and (5) any irreversible and irretrievable commitments of resources which would
be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.

U.S.C. § 4332; *Highway J*, 349 F.3d at 953. To determine whether an action "significantly" affects the quality of the environment, CEQ regulations instruct that the agency consider the context of the action and the intensity of the effect. 40 C.F.R. § 1508.27(a)-(b); *Highway J*, 349 F.3d at 953. These considerations can be fleshed out in an environmental assessment (an "EA"), which is a more brief version of an EIS that is prepared when the proposed action is neither one that clearly requires an EIS nor one that would be categorically excluded from the EIS process. *Highway J*, 349 F.3d at 953 (citations omitted). There are two possible results of an EA: a determination that an EIS is necessary, or a finding of no significant environmental impact (a "FONSI"). *Sierra Club* v. *U.S. Army Corps of Eng'rs*, 295 F. Supp. 1209, 1215 (11th Cir. 2002); 40 C.F.R. § 1501.3(c)-(e).

NEPA also requires consideration of reasonable alternatives to the proposed action. 40 C.F.R. § 1502.14 (describing the evaluation of alternatives as "the heart of the environmental impact statement"). An agency should address three questions in considering alternatives: (1) what is the purpose of the proposed action; (2) given that purpose, what are the reasonable alternatives to the project; and (3) to what extent should the agency explore each particular reasonable alternative? *Highway J*, 349 F.3d at 960-961 (citing *Simmons* v. *U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668 (7th Cir. 1997)). The context in which the alternatives are considered is a factor in determining which are "reasonable." *Id.* at 960.

Ultimately, courts have found that their only role in reviewing an agency's actions under NEPA is to confirm that the agency took a "hard look" at the environmental impacts of a proposed action. *Envtl Law & Policy Ctr.* v. *U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006); *Highway J*, 349 F.3d at 953 (citation omitted); *Sierra Club* v. *U.S. Army*

35

*Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (citation omitted); *Arkansas Wildlife*

*Fed'n* v. *U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005).

  B.  Clean Water Act

  The purpose of the CWA is to "restore and maintain the chemical, physical, and

biological integrity of the nation's waters." *Highway J Citizens Group* v. *U.S. Dep't of Transp.*,

2005 WL 1076071, at \*3 (E.D. Wis. April 27, 2005) (citing *S. Fla. Water Mgmt. Dist.* v.

*Miccosukee Tribe of Indians*, 541 U.S. 95, 102, 124 S. Ct. 1537, 158 L. Ed. 2d 264 (2004))

("*Highway J II*"). To serve this purpose, the Act prohibits the filling of wetlands without a

permit issued by the Corps under Section 404 of the CWA. 33 U.S.C. § 1344 (codifying § 404

of the CWA); *Highway J II*, at \*3; *Alliance for Legal Action* v. *U.S. Army Corps of Eng'rs*, 314

F. Supp. 2d 534, 542-43 (M.D.N.C. 2004); *Town of Norfolk* v. *U.S. Army Corps of Eng'rs*, 968

F.2d 1438, 1445 (1st Cir. 1992). The permit decisionmaking process is governed by regulations

issued by the EPA and the Corps. 33 U.S.C. § 1344(b); 40 C.F.R. § 230; 33 C.F.R. § 320. The

Corps can deny a permit altogether. 33 U.S.C. § 1344(c).

  The CWA distinguishes an individual permit from a "general" permit, whereby the Corps

can issue a permit on a state, regional, or national basis for a category of activities involving

discharges of dredged or fill material if the activities are similar, have minimal effects on the

environment, and also have minimal cumulative effects. 33 U.S.C. 1344(e). People can then

apply to make a discharge under the authority of a previously issued general permit.

  Under the Section 404 regulations, "no discharge of dredged or fill material shall be

permitted if there is a practicable alternative to the proposed discharge which would have less

adverse impact on the aquatic ecosystem, so long as the alternative does not have other

significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The regulation goes on to define what is "practicable": if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). If the proposed activity does not need to be located on an aquatic site in order to fulfill its purpose, practicable alternatives are presumed to exist. 40 C.F.R. § 230.10(a)(3). In this case, the Corps may not issue a permit unless the applicant provides clear and convincing evidence that there are no practicable alternatives. *Highway J II,* 2005 WL 1076071, at *11 (citation omitted). This burden lies with the permit applicant; the role of the Corps is only to determine whether the applicant has borne its burden. Plaintiffs' Br., at 30 n.29.

The "reasonable alternatives" analysis under NEPA usually provides enough information to perform the CWA's "practicable alternatives" test: "[f]or actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines." 40 C.F.R. § 230.10(a)(4).

In cases where the Corps permits the filling of wetlands, the applicant must mitigate the damage. 40 C.F.R. § 230.10(d). Mitigation includes "avoiding, minimizing, rectifying, reducing, and compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location." 33 C.F.R. § 320.4(r). The Corps

37

determines what mitigation requirements must be included in Section 404 permits, following standards in its own regulations as well as in non-binding guidance that it has jointly issued along with other federal agencies regarding two particular types of mitigation arrangements: mitigation banks and in-lieu fee arrangements.[19]  60 Fed. Reg. 58,605 (Nov. 28, 1995); 65 Fed. Reg. 66,914 (Nov. 7, 2000).

Generally, there are three options for mitigation: the permit applicant can undertake a project itself, it can purchase credits from a mitigation bank, or it can enter into an in-lieu fee agreement.  A mitigation bank is a site where wetland restoration, creation, enhancement, or preservation has been undertaken especially for the purpose of selling "credits" for units of restored, created, enhanced, or preserved wetlands to a permit applicant who needs to "debit" those units in order to mitigate for damage that it intends to cause to other wetlands.  60 Fed. Reg. 58,605-02.  An in-lieu fee is an arrangement whereby a permit applicant provides funds to a third party (usually a natural resource management entity) who agrees to undertake the mitigation in the future, instead of completing the mitigation itself or purchasing mitigation bank credits.  65 Fed. Reg. 66,914.

C.      Vision 100 - Century of Aviation Reauthorization Act

The recent enactment of the Vision 100 - Century of Aviation Reauthorization Act ("Vision 100") both complicates and simplifies the court's analysis of the obligations of the

---

[19] This guidance is not intended to create any rights enforceable by any party in litigation with the United States.  60 Fed. Reg. 58,605-02; *Cf. Sierra Club* v. *Flowers*, 423 F. Supp. 2d 1273, 1285 (D.C. Cir. 2006) (citations omitted) (holding that deference to an agency's decision is not required if the agency has failed to follow its own binding regulations; such conduct is inherently arbitrary and capricious).

Corps under NEPA and the CWA.  Section 47171 of Vision 100 includes several provisions that

are relevant to this case:

> § 47171(a) **Aviation project review process**.  The Secretary of Transportation
> shall develop and implement an expedited and coordinated environmental review
> process for airport capacity enhancement projects at congested airports, aviation
> safety projects, and aviation security projects that –
> ***
> (2) provides that all environmental reviews, analysis, opinions, permits, licenses,
> and approvals that must be made by a Federal agency or airport sponsor for such a
> project will be conducted concurrently, to the maximum extent practicable; and
> (3) provides that any environmental review, analysis, opinion, permit, license, or
> approval that must be issued or made by a Federal agency or airport sponsor for
> such a project *will be completed within a time period established by the Secretary*,
> in cooperation with the agencies identified under subsection (d) with respect to
> the project.
> ***
> (c) **High priority of and agency participation in coordinated reviews**.
> (1) **High priority for environmental reviews**.  Each Federal agency with
> jurisdiction over an environmental review, analysis, opinion, permit, license, or
> approval shall accord any such review, analysis, opinion, permit, license, or
> approval involving an airport capacity enhancement project at a congested airport
> ... the highest possible priority and conduct the review, analysis, opinion, permit,
> license, or approval expeditiously.
> ***
> (h) **Lead agency responsibility**.  The Federal Aviation Administration shall be
> the lead agency for ... airport capacity enhancement projects at congested airports
> and shall be responsible for defining the scope and content of the environmental
> impact statement, consistent with regulations issued by the Council on
> Environmental Quality.  Any other Federal agency or State agency that is
> participating in a coordinated environmental review process under this section
> *shall give substantial deference, to the extent consistent with applicable law and
> policy, to the aviation expertise of the Federal Aviation Administration*.
> ***
> (j) **Purpose and need**.  For any environmental review, analysis, opinion, permit,
> license, or approval that must be issued or made by a Federal or State agency that
> is participating in a coordinated review process under this section and that
> requires an analysis of purpose and need for the project, the agency,
> notwithstanding any other provision of law, *shall be bound by the project purpose
> and need as defined by the Secretary*.
>
> (k) **Alternatives analysis**.  The Secretary shall determine the reasonable
> alternatives to an airport capacity enhancement project at a congested airport ...

> Any other Federal agency, or State agency that is participating in a coordinated review process under this section with respect to the project, *shall consider only those alternatives to the project that the Secretary has determined are reasonable*.

49 U.S.C. § 47171 (emphasis added).[20]  Although these provisions have been in effect for a few years now, according to the court's research, they have never been cited or interpreted in a previous case.  Therefore, Section 47171's impact on the Corps's obligations under NEPA and the CWA is an issue of first impression for this court.


V.     Standard of Review

A.     Administrative Procedure Act

The court is allowed only a narrow scope of review in evaluating the Corps's actions, findings and conclusions under NEPA and the CWA.  5 U.S.C. § 706(2); *Highway J*, 349 F.3d at 952-53; *Highway J II*, 2005 WL 1076071, at *4-*5 (citing *Greater Yellowstone Coalition* v. *Flowers*, 359 F.3d 1257, 1268 (10th Cir. 2004).[21]  The Corps's decisions may be set aside only if the court finds them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).  Under this standard, the court's review is "'searching and careful,'[22] but 'the

_____

[20] The session law, Pub. L. No. 108-176, Title III, § 308, 117 Stat. 2539 (Dec. 12, 2003), provided that: "Nothing in this subtitle ... shall preempt or interfere with ... any obligation to comply with the provisions of [NEPA] and the regulations issued by the Council on Environmental Quality to carry out such Act."

[21] *See also Village of Bensenville* v. *Federal Aviation Administration*, 457 F.3d 52, 70 (D.C. Cir. 2006) (citation omitted) ("A party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed.").

[22] Indeed, some courts have described the court's duty to "immerse" itself in the administrative record before making a decision.  *Sierra Club* v. *Flowers*, 423 F. Supp. 2d 1273, 1284 (S.D. Fla. 2006).

40

ultimate standard of review is a narrow one.'" *Highway J*, 349 F.3d at 952-53 (citing *Marsh*, 490

U.S. at 378). The court can only ask "'whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment.'" *Id*. Any such substantive

or procedural error must be substantial in order to warrant vacating the agency's decision.

*Hoosier Envtl Council, Inc.*, v. *U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 998 (S.D. Ind.

2000) (citing *Baltimore Gas & Elec. Co.* v. *Natural Resources Defense Council, Inc.*, 462 U.S.

87, 97, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983)). The court cannot overturn the Corps based on

disagreement with the Corps's ultimate decision. *Baltimore Gas*, 462 U.S. at 97. In this way,

the district court acts like a reviewing court, without taking new evidence or having an

evidentiary hearing, and considers only matters within the administrative record. *Highway J II*,

2005 WL 1076071, at *5 (citing *Cronin* v. *U.S. Dep't of Agric.*, 919 F.2d 439, 443-44 (7th Cir.

1990); 5 U.S.C. § 706; *Fla. Power & Light Co*. v. *Lorion*, 470 U.S. 729, 743-44, 105 S. Ct. 1598,

84 L. Ed. 2d 643 (1985)).[23]


B.      Summary Judgment

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine issue of fact exists, the court must look beyond the

pleadings and assess the proof as presented in the record. Fed. R. Civ. P. 56(c) Advisory

---

[23] There are various disputes regarding whether certain documents that are not in the administrative record can be considered here. Because the court finds that even if these documents are considered, that summary judgment must still be granted to the Corps, the disputes are not addressed in this opinion.

Committee's notes. The party seeking summary judgment bears the burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Ruffin-Thompkins* v. *Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). A material fact must be outcome determinative under the governing law. *Insolia* v. *Philip Morris, Inc*, 216 F.3d 596, 598-99 (7th Cir. 2000).

The court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986); *Abdullahi* v. *City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). This obligation is carefully balanced against the competing obligation to give deference to the Corps's expertise. *Highway J*, 349 F.3d at 953.

VI.     Discussion

      A.     NEPA

            1.     The adequacy of the Corps's Environmental Assessment and Mitigated Finding of No Significant Impact

Plaintiffs' first argument is that it was unlawful for the Corps to rely on its EA and mitigated FONSI because the OMP is a major federal action with significant impacts to wetlands, and therefore the Corps had to prepare an EIS. Plaintiffs' Br., at 23. While conceding that the Corps "might have been able to rely on the FAA EIS," they contend that it only adopted the FAA EIS "with respect to key issues," and failed to explicitly adopt it to satisfy its own obligations under NEPA. *Id*. at 23-24. Additionally, plaintiffs argue that the Corps was not a joint preparer of the FAA EIS and that it failed to independently assess the environmental impacts of the OMP. *Id*. at 23-25 (citing, *inter alia*, 40 C.F.R. § 1506.3; 33 C.F.R. § 325 App. B,

at 8(c)).

Taking the easiest question first, there is no question that the Corps was a cooperating agency in the preparation of the FEIS. The Corps entered into an agreement to work with the FAA on the FEIS, which included a breakdown of responsibilities among the agencies. Defendants' Statement, at ¶ 5; AR-20563; 14451. The agencies recognized the fact that they did in fact work together on the project. AR-10504; 10824; 11005; 11528; 18939. In Appendix T of the FEIS, which describes agency coordination, the FAA catalogued the Corps's extensive involvement in preparing the FEIS. AR-14454-82. The FEIS says "several meetings between the FAA and USACE were held throughout the development of the EIS. Topics for these meetings included review of purpose and need as well as project alternatives, potential overall impacts of development at O'Hare, review of overall wetland and Waters of the U.S. (WUS) impact analyses, coordination on Section 404 permit application, [and] [d]iscussion of mitigation concepts associated with obtaining a Section 404 permit ... [Additionally,] [e]xtensive coordination with the USACE was required for handling wetland mitigation." AR-14454. At least 28 inter-agency meetings are documented in the FEIS. AR-14478. *See also* Defendants' Br., at 33-34. This evidence, taken together with the Corps's own statements,[24] conclusively establish that the Corps was a cooperating agency in preparing the FEIS. It also supports the Corps's assertion that it did independently assess the environmental impacts of the OMP.[25]

Regardless of the specific terminology that it used, the Corps unequivocally adopted the

---

[24] *See, e.g.*, AR-22672.

[25] The court also notes that plaintiffs have not pointed to any information that the Corps failed to consider. *See Simmons*, 1996 WL 1323088 at *10.

FEIS. In its EA, the Corps said "[a]s a cooperating agency in the review of the Draft

Environmental Impact Statement (DEIS) for the project, the U.S. Army Corps of Engineers

(USACE) has agreed to adopt and incorporate the Final Environmental Impact Statement (FEIS)

and the Record of Decision (ROD) into our decisionmaking process with respect to key issues

such as the [Section] 404(b)(1) Guidelines, purpose and need, alternatives analysis, [and] public

interest review factors. Refer to the FEIS and ROD for a detailed analysis describing the

Corps's final determinations presented in this decision document." AR-20602. *See also* AR-

20585; 20594. The Section 404(b)(1) guidelines refer to the Corps's responsibilities regarding

the Section 404 permit, which was its principal role in evaluating the OMP. The purpose and

need, alternatives analysis, and public interest review factors sections are the heart of the FEIS.

The Corps's explicit adoption of these sections, and its implicit adoption of the FEIS in general,

made sufficiently clear that the Corps was adopting all relevant portions of the FEIS.

   The Corps was not required to start from scratch and prepare another EIS regarding the

entire OMP. The FAA, in cooperation with the Corps, already did that, and its FEIS is an

extremely long, comprehensive document that obviously required a monumental amount of

work. Duplicating that effort would be wasteful and contrary to both the Vision 100 Act and the

CEQ regulations. "Agencies are not required to duplicate the work done by another federal

agency which also has jurisdiction over a project." *Sierra Club*, 295 F.3d at 1215. Where

multiple agencies are involved, a lead agency prepares an EIS, and a cooperating agency can

adopt that EIS if it independently reviews the EIS and is satisfied that its comments and

suggestions are satisfied. 40 C.F.R. §§ 1501.5, 1501.6, 1506.3(c). As noted above, that

procedure was followed here.

Similarly, agencies are "encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of the environmental review." 40 C.F.R. § 1502.20 (citing 40 C.F.R. § 1502.28); *see also* 40 C.F.R. §§ 1502.21 ("[a]gencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."); 1506.4 (allowing an agency to combine another NEPA document with its own to reduce duplication of efforts). Whenever an agency has prepared a broad EIS, and a subsequent statement or EA is then prepared regarding a component of the larger project, the subsequent EA need only summarize the issues discussed in the broader statement and incorporate discussions from that statement by reference, concentrating instead on matters specific to the subsequent action. *Sierra Club*, 295 F.3d at 1215; 40 C.F.R. § 1502.20. Putting the tiering regulations together with the cooperating agency regulations, if a cooperating agency adopts the EIS of a lead agency, it can presumably treat that EIS as its own and tier off of that EIS in a subsequent EA or a supplemental EIS. *Sierra Club*, 395 F.3d at 1220. That is what happened in this case: the Corps is a cooperating agency with the FAA, adopted the FEIS regarding the OMP as a whole, and then tiered off of the FEIS an EA regarding the issues specific to the Section 404 permit, which is a component of the larger OMP project.

Plaintiffs' position may be construed as an argument that the Corps should have prepared a supplemental EIS. Agencies are required to prepare a supplemental EIS (an "SEIS") if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental

45

concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). The decision whether to prepare an SEIS is similar to the decision whether to prepare an EIS in the first place: if the new action will "significantly affect the quality of the human environment" in a significant manner or to a significant extent not already considered, an SEIS must be prepared. *Marsh*, 490 U.S. at 374. The determination of whether a change is significant is left to the discretion of the Corps. *Arkansas Wildlife*, 431 F.3d at 1104.

When the Corps prepared its EA, there was no significant change in the OMP project other than the mitigation plan. AR-20603-04. The new plan was thoroughly evaluated in the EA, where the Corps summarized and provided substantive responses to the comments on the revised plan. AR-20606-13. A change in the mitigation plan is not something that would significantly affect the quality of the environment in a way not previously considered. *Sierra Club*, 295 F.3d at 1221-22; *Arkansas Wildlife*, 431 F.3d at 1103. Ultimately, the effects of changing the mitigation plan were appropriately considered by the Corps in its EA, and requiring it to prepare a document with a different title would be pointless.

Plaintiffs also object conceptually to the fact that the Corps found in its EA that the OMP will have a significant effect on wetlands, but ultimately issued a Finding of No Significant Impact; that the Corps issued a "mitigated FONSI." Plaintiffs' Br., at 23. Plaintiffs argue that the finding of significant impacts necessitated the preparation of an EIS. First, this argument disregards the Corps's reliance on the FEIS that was already prepared. Here, the EA and mitigated FONSI do not have to stand on their own; the FEIS has already acknowledged and addressed the environmental impacts of the OMP as a whole. The EA and mitigated FONSI only needed to address the change in the mitigation plan. Second, there is precedent that an EA

46

and a mitigated FONSI can be sufficient even for an entire project. *Ware* v. *U.S. Federal Highway Admin.*, 2006 WL 696551, at *23 (S.D. Tex. March 15, 2006) (approving the issuance of an EA with a mitigated FONSI where impacts from a highway development project that might otherwise have been significant were rendered insignificant through the recommendation of mitigation measures, despite the fact that the plaintiffs contested the effectiveness of those measures); *Spiller* v. *White*, 352 F.3d 235, 240-241 (5th Cir. 2004) ("we find nothing objectionable about the fact that the issuance of the FONSI was predicated on [the permit applicant] agreeing to certain mitigation measures"); *see also C.A.R.E. Now* v. *Federal Aviation Admin.*, 844 F.2d 1569, 1572 n.3 (11th Cir. 1988) (citing cases); *Cabinet Mountains Wilderness* v. *Peterson*, 685 F.2d 678, 683 (D.C. Cir. 1982).[26] Here, the Corps noted the mitigation that would be required from the City in exchange for the Section 404 permit and issued a FONSI only after noting those mitigation requirements. AR-20618-20; 20628.

The Plaintiffs' argument has some rhetorical force, in that it could be said that the agency is substituting its conclusion for its analysis, but this is not a case where that point is persuasive. Additionally, to the extent that plaintiffs are objecting to the fact that the Corps checked a box on its EA finding that there was "no appreciable effect on any special aquatic sites," AR-20622, this is inconsequential given the recognition of the significant effect on wetlands in the FAA's FEIS.

Finally, plaintiffs argue that the FONSI did not comply with procedural requirements

---

[26] Plaintiffs attempt to distinguish these cases on the basis that they dealt with situations in which all environmental impacts of a project were completely mitigated, whereas here the mitigation only applied to OMP's impacts to wetlands, and not the other environmental effects of the project. This argument is not persuasive because the other significant environmental impacts of the OMP were considered in the FEIS and were outside of the scope of the Corps's jurisdiction, which was to consider the City's application for a Section 404 permit to fill wetlands.

because it did not summarize the EA and note any other environmental documents related to it, citing 40 C.F.R. § 1501.7(a)(5). The Corps correctly points out that this regulation is inapplicable, and that the right regulation is § 1508.13, which provides that a FONSI must include the EA or a summary of it and note any related environmental documents. The FONSI was an integrated part of the EA, and the EA cited from the FAA's FEIS. Therefore, the applicable regulation was satisfied. Plaintiffs also argue that the Corps's failure to provide 30 days for public notice and comment on the EA violated CEQ regulations. The cited regulation, § 1501.4(e)(2), applies only where the action is one that would normally require an EIS, and therefore does not apply here. Even if it did apply, however, the Corps provided more than 30 days for public notice and comment on the revised mitigation plan, which was the only significant change in the OMP since the issuance of the FEIS. In any event, neither of these procedural objections, even if well-taken, would show substantial noncompliance with NEPA, and therefore they cannot provide a basis to vacate the Corps's decision. *Hoosier,* 105 F. Supp. 2d at 998; *Highway J,* 349 F.3d at 960.

### 2.     The adequacy of the Corps's analysis of alternatives

Plaintiffs challenge the Corps's adoption of the FAA's alternatives analysis because they disapprove of the FAA's decision to eliminate the off-site and blended alternatives from detailed environmental analysis. Plaintiffs' Br., at 28-30. As noted above, the FAA conducted a multi-tiered screening process for evaluation of potential project alternatives. Defendants' Statement, at ¶ 9; AR-10615-16. Those that passed both tiers of reasonableness review were retained for detailed consideration (including environmental impact analysis). AR-10615-16. A blended

48

alternative (involving some construction at O'Hare and some off-site elements) was created and retained for the second tier of the purpose and need analysis, but the FAA ultimately eliminated all alternatives that did not involve constructing new runways at O'Hare ("on-site alternatives") before conducting its detailed environmental analysis.  Plaintiffs' Statement, at ¶ 63; AR-10663.

Although couched in terms of the Corps's failure to assure that the FAA's NEPA information is sufficient for its purposes, Plaintiffs' challenge is a disagreement with the substantive decision made by the FAA.  This challenge is foreclosed by the Vision 100 Act.  49 U.S.C. § 47171(k)'s mandate is that "[t]he Secretary shall determine the reasonable alternatives to an airport capacity enhancement project at a congested airport ....  Any other Federal agency, or State agency that is participating in a coordinated review process under this section with respect to the project *shall consider only those alternatives to the project that the Secretary has determined are reasonable.*"  49 U.S.C. § 47171(k) (emphasis added).  Requiring the Corps to consider other alternatives would only waste the Corps's time, because alternatives rejected by the FAA could never be selected.

Even regardless of this mandate, and of the requirement in 49 U.S.C. § 47171(h) that the Corps give deference to the FAA, the Corps's adoption of the FAA's alternatives analysis was appropriate, because the FAA reasonably eliminated all off-site alternatives and the blended alternative as unreasonable.  The NEPA regulations require that an EIS "briefly discuss" the reasons why alternatives are eliminated, 40 C.F.R. § 1502.14, and the FEIS did so.  The FEIS stated that the off-site alternatives were eliminated based on their inability to reduce delays at O'Hare and accommodate or alleviate increasing air travel demand, as well as the City's inability to effectuate the alternatives.  AR-10632-35; 10647-52.  Alternatives that do not meet

the purpose and need of the project are *per se* unreasonable. *City of Bridgeton* v. *FAA*, 212 F.3d 448, 456 (8th Cir. 2000). The blended alternative was eliminated because, among other problems, it consists of speculative technological and infrastructure developments combined with a fundamental restructuring of the aviation marketplace, which is outside of the control of the government and the City. AR-10663-64.

The decisions that the FAA made here are consistent with cases in which the courts have upheld the FAA's alternatives analyses for airport expansion projects. *See, e.g., City of Bridgeton*, 212 F.3d at 459 (finding that the FAA's tiered analysis of alternatives and elimination of those that did not satisfy the purpose and need for the project from detailed environmental analysis was reasonable); *Airport Neighbors Alliance, Inc.,* v. *U.S.*, 90 F.3d 426 (10th Cir. 1996); *Suburban O'Hare Comm'n* v. *Dole*, 787 F.2d 186, 196 (7th Cir. 1986) (holding that it was not unreasonable for the FAA to disregard alternatives that were outside of the City of Chicago's control). Finally, the court notes that the FAA's actions in preparing the FEIS for this project have already been evaluated by the District of Columbia Circuit, and that Court found that the FAA "acted with great care in conducting its analysis for the EIS and ROD." *Village of Bensenville*, 457 F.3d at 72. By extension, it was not arbitrary or capricious for the Corps to rely on the conclusions in the FEIS regarding which alternatives were reasonable under NEPA.

3.      The adequacy of information provided regarding mitigation

Plaintiffs' final challenge to the Corps's compliance with NEPA is their argument that the Corps failed to provide public notice of the mitigation plan that it ultimately authorized, and that the FEIS did not contain sufficient information about the final mitigation plan. Plaintiffs'

Br., at 26-28. Because the conceptual mitigation plan that was described in the DEIS, the FEIS, and the public hearings regarding those documents was different from the mitigation plan ultimately approved in the Section 404 permit, the plaintiffs complain that they were "misled about the mitigation," and that the "Corps failed to provide any public notice of the significantly changed mitigation plan it actually authorized." Plaintiffs' Br., at 26-27.

It is correct that information regarding mitigation of environmental impacts must be included in an EIS. 40 C.F.R. §§ 1502.14(f); 1502.16(h); 1505.2(c); 1508.25(b)(3)); *Robertson*, 490 U.S. at 351-52. Plaintiffs concede, though, that an EIS need not contain the final mitigation plan. Plaintiffs' Br., at 26; *Robertson*, 490 U.S. at 352-53 ("it would be inconsistent with NEPA's reliance on procedural mechanisms - as opposed to substantive, result-based standards - to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."). It is apparent in this case that the conceptual mitigation plan that was included in the DEIS and FEIS was the City and the Corps's current plan at the time that those documents were published. There is no evidence that the Corps intentionally misled the public. Instead, the Corps continued to review the City's proposed mitigation plan, and finding some of the proposed sites to be unacceptable, required the City to revise its proposal. Defendants' Statement, at ¶ 17.

Regarding the plaintiffs' second point, it is disingenuous to argue that the Corps provided no public notice of the final mitigation plan. The entire subject of the Corps's Second Supplemental Public Notice was the revised plan. Defendants' Statement, at ¶ 28. The Notice described the City's proposal as involving purchasing credits from the new Lily Cache bank and establishing an in-lieu fee arrangement with CorLands. *Id*. The Notice also described the role

51

that the Mitigation Review Team would play in reviewing and approving appropriate mitigation projects from the mitigation proposals that CorLands would make. *Id.* It solicited public comment during a 30 day period (which was later extended to October 24, 2005), and plaintiffs themselves submitted comments. Defendants' Statement, at ¶ 26; AR-20813; 20822. These comments were noted and addressed in the Corps's EA. AR-20606-13.

In summary, the court concludes that there is no genuine issue of material fact that the Corps did take a hard look at the environmental impact of the OMP, and that it did not act arbitrarily or capriciously in complying with its NEPA obligations in connection with granting the Section 404 permit.

      B.      CWA

            1.      Did the Corps require the City to "clearly demonstrate" that no practical alternatives existed?

Plaintiffs object to the fact that the Corps incorporated the reasonable alternatives analysis from the FAA FEIS to satisfy its CWA responsibility to require the City to "clearly demonstrate" that there were no less environmentally damaging "practicable alternatives" to the OMP. They complain that off-site alternatives or the blended alternative might have had less environmental impact, but that the FAA did not provide much environmental information about them, and that the record did not provide enough information for the Corps to decide whether those alternatives were practicable. Additionally, plaintiffs argue that because the "blended alternative" was found to have the potential to meet the project's purpose and need and to potentially cost less than the other alternatives, that it was therefore "practicable."

As noted above, to be "practicable" under the CWA, an alternative must be "available

52

and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In comparison, the definition of "reasonable" that the FAA used in conducting the second tier of its alternatives analysis was "those that are practical or feasible from the technical and economic standpoint and using common sense." AR-10616. These definitions are substantively the same, and the FAA noted that in its review: "Because the concepts of reasonableness [and] practicality ... are so similar, it would make little sense to conduct separate sets of analyses for these retained alternatives under each of the [applicable] statutes .... Therefore, the FAA has integrated into the secondary screening a common-sense understanding of these similar concepts." AR-10658.

This case is like most, in which the NEPA analysis of alternatives provides the information necessary for the practicable alternatives evaluation, 40 C.F.R. § 230.10(a)(4). Plaintiffs concede that the FAA was owed deference in determining which alternatives could meet the purpose and need of the OMP in the initial tier of review of alternatives. Plaintiffs' Reply, at 33. The FAA provided specific and logical reasons why the blended alternative was not reasonable or practicable, including that it would require a fundamental restructuring of the marketplace for aviation demand which is obviously not within the control of the City or the FAA. The Corps was justified in relying on that conclusion in the CWA context just as it was in the NEPA context discussed above. *See Hoosier,* 105 F. Supp. 2d at 1001; *Town of Norfolk* v. *U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1448 (1st Cir. 1992) ("Under the practicable alternatives test, the Corps is not required to conduct an independent feasability evaluation of each alternative site merely because a party disagrees with its ultimate conclusion."). Contrary to plaintiffs' suggestion, the fact that the blended alternative had the potential to satisfy the

purpose and need of the OMP and that it cost less than other alternatives is not sufficient to make it "practicable." It had to also be capable of being done after taking into consideration existing technology, and the FAA reasonably found that it was not.

The Vision 100 Act makes the Corps's conclusion unassailable. Plaintiffs contend that 49 U.S.C. § 47171(k) applies only to the Corps's duties under NEPA. Plaintiffs' Br., at 32 n.33. This appears to be an issue of first impression, as the court has found no case citing § 47171(k). The language of the statute is not ambiguous here, however, as § 47171(k) clearly applies to the Corps's CWA duties. Section 47171(k) says that "[a]ny other Federal agency ... that is participating in a coordinated review process under this section with respect to the project *shall consider only those alternatives to the project that the Secretary has determined are reasonable*." 49 U.S.C. § 47171(k) (emphasis added). This does not distinguish between an agency's duties under NEPA versus any other statute. In fact, the section makes reference several times to its applicability to all environmental "reviews, analyses, opinions, permits, licenses, and approvals" that are required for airport capacity enhancement projects at congested airports, which unambiguously would include a Section 404 permit. 49 U.S.C. §§ 47171(a), 47171(c), 47171(i), 47171(j). The fact that this list was not included in § 47171(k) does not convince the court that Congress wanted § 47171(k) to have more limited applicability, because § 47171(k) is generally applicable to all situations by its own terms, even without the list. The Corps was a federal agency participating in a coordinated review process for a capacity enhancement project for a congested airport, AR-11528, and was bound by § 47171(k)'s admonition in its evaluation of the Section 404 permit application. Because the FAA found the off-site and blended alternatives to be unreasonable, the Corps was prohibited from considering

54

them in further detail and was not arbitrary or capricious in declining to do so.

2.    Was approval of the in-lieu fee arbitrary and capricious?

Plaintiffs' belief that the Corps's approval of the in-lieu fee was arbitrary and capricious is the heart of their entire case.  Without this, they likely would not have challenged the Corps's decision to grant the permit at all.  Transcript of Oral Argument at 4-5, *Nat'l Mitigation Banking Ass'n* v. *U.S. Army Corps of Eng'rs*, Case No. 06-2820 (November 30, 2006) ("[My clients] never thought we'd be here because the permit started out on the right foot.  Everybody knew that to expand the O'Hare Airport would involve impacts to wetlands and streams....  [T]he crux of our complaint here [] is that authorizing the mitigation for this – for this quantity of impacts [with] an in-lieu fee arrangement was inappropriate under the law, not reasonable, and arbitrary and capricious.").

As mitigation for the OMP's impact on the wetlands at O'Hare, the Section 404 permit for the OMP requires the City to (1) pay a flat fee of $26,466,429.00 to CorLands as an in-lieu fee provider responsible for 280.14 acres of off-site mitigation, and (2) purchase 62.26 acres of mitigation credits from Lily Cache for $4,544,980.00.  *Id.*  The in-lieu fee is governed by the prospectus, the agreement between the City and CorLands, the ICA, and the permit itself.

The Corps justifies the mitigation plan on the basis of the interaction of § III(A) of the In-Lieu Fee Guidance, which allows for the use of an in-lieu fee to compensate for impacts authorized by individual permit if the arrangement is developed, reviewed, and approved using the process established for mitigation banks in the Banking Guidance, and § II(C) of the Banking Guidance, which provides the procedure to be used in the establishment of mitigation banks.  65

55

Fed. Reg. 66,914, at III(A); 60 Fed. Reg. 58,605, at II(C). The Corps also cites § II(C)(2) of the Banking Guidance, which provides for "umbrella" instruments for "regional banking programs sponsored by a single entity ... for the establishment and operation of multiple bank sites." 60 Fed. Reg. 58,605, at II(C)(2); *see also* 65 Fed. Reg. 65,914, at IV(B) (providing for in-lieu fee umbrella arrangements). "In such circumstances, the need for supplemental site-specific information (e.g., individual site plans) should be addressed in the banking instrument." 60 Fed. Reg. 58,605, at II(C)(2).

The Corps has discretion to set mitigation terms, Plaintiffs' Br., at 33, and its internal guidance is not binding regulation. *U.S.* v. *Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000); 60 Fed. Reg. 58,605-02. In some circumstances, however, an agency's noncompliance with its own guidance can be a basis to find its actions arbitrary and capricious. *Rhodes* v. *Johnson*, 153 F.3d 785; *cf Alliance for Legal Action*, 314 F. Supp. 2d at 552-555. In this case, plaintiffs have argued that the Corps did not comply with the Banking Guidance and the In-Lieu Fee Guidance to such a great extent that its approval of the mitigation plan was rendered arbitrary and capricious. Oral Argument, at 22.

a.    Did the Corps follow the procedures required for mitigation banks?

Plaintiffs' first specific basis for arguing that the Corps's approval of the in-lieu fee was arbitrary and capricious is that the in-lieu fee was not approved using the process required for approving a mitigation bank, as is required by the In-Lieu Fee Guidance.[27] Section III(A) of the

---

[27] In their opening brief, plaintiffs argued that the in-lieu fee needed to be approved as a mitigation bank. Plaintiffs' Br., at 35. After defendants pointed out the distinction between a fee being approved "as a mitigation bank" and "using the process established for mitigation banks,"

In-Lieu Fee guidance provides as follows: "Impacts Authorized under Invididual Permit: In-lieu-fee agreements may be used to compensate for impacts authorized by individual permit if the in-lieu fee arrangement is developed [], reviewed, and approved using the process established for mitigation banks in the Banking Guidance. 65 Fed. Reg. 66,914, at III(A). Both parties agree that the required process is "submission of a prospectus, establishment of a banking instrument, identification of [a] mitigation review team, public notice and comment." Plaintiffs' Reply, at 22. Their points of disagreement are whether the Corps followed this process in approving the in-lieu fee, and whether the prospectus and the instrument must contain the same substantive information as would be required of a mitigation bank.

As noted above, CorLands submitted a detailed prospectus to the City on August 31, 2005, AR-21108-12, and the banking instrument is the ICA for the O'Hare Modernization Mitigation Account signed by the new MRT in December of 2005. The prospectus, along with the agreement between CorLands and the City, and the ICA also provide a specific process for the preparation of a prospectus and site development plan for each individual project that will be funded by the OMMA. An MRT was established by the ICA. AR-20636. Public notice of the in-lieu fee arrangement was provided in the Corps's Second Supplemental Public Notice in September of 2005, which allowed for a comment period. AR-20590.[28] Therefore, there is no dispute that the Corps completed each of the procedural steps for establishing a mitigation bank. Additionally, the same procedural steps will be followed for each individual project undertaken

---

Defendants' Br., at 41, plaintiffs conceded their error.

[28] Plaintiffs' citation to § II(C)(5) of the Banking Guidance to argue that the Corps was required to provide the prospectus itself for public comment is not valid, because the portion cited refers to proposals that do not require an individual Section 404 permit.

by CorLands, thereby satisfying the procedural requirements of the Banking Guidance again and again for each project.

Plaintiffs argue that the prospectus and the ICA needed to contain the substantive elements required of such documents in the Banking Guidance. Plaintiffs' Reply, at 22-23. This argument is illogical and disregards the fact that there is a difference between an in-lieu fee and a mitigation bank. Plaintiffs concede that if an in-lieu fee plan were required to follow the procedure required for a mitigation bank and also have the substance required for a mitigation bank, there would be no difference between a fee and a bank. Plaintiffs' Reply, at 23. Therefore, the Corps's interpretation of its guidance not to require such substance is reasonable and certainly entitled to deference. Furthermore, the ICA provides that the substantive requirements for prospectuses and banking instruments will be complied with in the documents prepared for individual projects undertaken under the OMMA.[29]

> b.   Was the manner in which CorLands was chosen and its fee set arbitrary and capricious?

Plaintiffs alternatively argue that the substantive requirements for in-lieu fees were

---

[29] The Banking Guidance recommends the following items be included "as appropriate" in a banking instrument: goals and objectives; ownership of bank lands; bank size and classes of wetlands and/or other aquatic resources proposed for inclusion in the bank, including a site plan and specifications; description of baseline conditions at the bank site; geographic service area; wetland classes or other aquatic resource impacts suitable for compensation; methods for determining credits and debits; accounting procedures; performance standards for determining credit availability and bank success; reporting protocols and monitoring plan; contingency and remedial actions and responsibilities; financial assurances; compensation ratios; and provisions for long-term management and maintenance. The prospectus and the ICA require the majority of these elements to be included in the banking instruments that will be created for the individual sites. AR-21112; 20638.

applicable to the in-lieu fee agreement approved here. Their main points are that the Corps did not include information in the record regarding CorLands' qualifications, and that the Corps did not ensure that the funds collected are based on a reasonable cost estimate of all funds needed to compensate for the impacts to wetlands. Defendants counter that these requirements are only applicable to fees that are used to mitigate for general permits, and are a mutually exclusive alternative to § III(A) of the February 7, 2007 In-Lieu Fee Guidance, which applies here. Regardless of this dispute, the court finds it prudent to examine the merits of these two points.

The Corps recommended CorLands to the City in its letter of April 6, 2005, in which it informed the City that it was rejecting three of the remaining six mitigation bank proposals and that the City was therefore short of mitigation bank credits. AR-22709. In response to a comment to its Second Supplemental Public Notice, the Corps said "CorLands has had many years experience in the management of lands, and the administration of funds and activities relating to wetland enhancement and restoration. CorLands has experience with in-lieu fee programs, having run a successful program for two years within the Chicago District jurisdiction. A review of the government studies put forth by the General Accounting Office and the National Academy of Sciences showed that this fund did well in light of other in-lieu fee programs across the nation." AR-20611.

Plaintiffs further argue that the Corps was arbitrary in approving the in-lieu fee amount to be paid to CorLands because it did not independently evaluate the fee level or make sure that the funds would be adequate to compensate for the impacts. Plaintiffs note that the fee may be "too low, too high, or just right, but there is no basis on which to conclude that the Corps did its job to make that assessment." Plaintiffs' Br., at 38. In response to a similar comment to its Second

59

Supplemental Public Notice, the Corps said "[t]he goal of the in-lieu fee instrument is to successfully implement a minimum of 280.14 acres of wetland mitigation.  The amount of monies advanced by the OMP for compensation was calculated by CorLands based on the cost of acquisition, development, and implementation of mitigation sites.  The monies provided by the OMP to CorLands will be used for replacing wetland functions and values as required by the guidance (Section IV(A)(7) In-Lieu Fee Guidance)."  AR-20611.  The Corps also argues that it knows the market rate for mitigation credits, and that the the $25 million figure is reasonable because its cost per mitigation credit is $92,623, which is near the average for the proposals that the City received in response to its request for proposals.  Defendants' Br., at 42-43; Defendants' Reply, at 19-20.

While the court notes that the Corps would have been well-advised to include more information regarding the way that the in-lieu fee was set in the record, these matters involve issues that are particularly suited to stay within the discretion of the Corps.  There is no basis in the record to hold that the Corps considered inappropriate factors in making these decisions, or that it made a clear error of judgment, as would be required to overturn the decision.[30]

c.    Did the Corps have alternative mitigation available that should have been selected?

The final argument[31] to be addressed is plaintiffs' claim that there was alternative,

---

[30] Plaintiffs also argue that the lack of financial assurances for the fee renders the approval invalid, but the court finds that the various audits and financial reports required by the prospectus and the ICA sufficiently answer that concern.

[31] Any other arguments made by plaintiffs that were not specifically addressed here were considered and have been rejected.

adequate, available mitigation that the Corps should have selected, in the form of various mitigation banks (some of which are sponsored by plaintiffs). This claim is strongly refuted by the record, which shows that the City looked for mitigation bank options for more than three years and proposed more than a dozen potential sites to the Corps. The Corps investigated all of these sites and visited many of them, but ultimately rejected all but three, for well-supported reasons that are documented in the record. *See, e.g.,* Plaintiffs' Statement, at ¶¶ 22, 25; Defendants' Statement, at ¶¶ 15, 17. Plaintiffs' citation to a few specific sites that allegedly should have been selected is undermined by the Corps's specific reasons why those sites were not appropriate. *See* Defendants' Br., at 49.

VII.    Conclusion

Plaintiffs' brief is essentially an attack on the use of in-lieu fees for any individual permit. The theme of their arguments is that in-lieu fee mitigation is not mitigation at all. In-lieu fees are legal, however, and it is not the court's place to play legislature and declare that the approval of an in-lieu fee is inherently arbitrary and capricious.[32] The parties agree that mitigation banks are preferable over in-lieu fees. They also agree that the key to successful mitigation rests on appropriate site selection and approval of specific mitigation plans. Defendants' Br., at 40 (citing Plaintiffs' Br., at 31). The Corps received and considered many comments expressing negative views of in-lieu fees in general, AR-20607-13, and was aware of reports that made negative findings about the performance of some in-lieu fees. AR-21820. The

---

[32] Defendants are correct when they point out that the proper forum for plaintiffs' arguments that in-lieu fees are generally ineffective is the consideration of the newly proposed mitigation rule.

Headquarters of the Corps was also drafting a proposed mitigation rule during 2005, which *if approved* would phase out the use of in-lieu fees as mitigation for Section 404 permits over five years. Plaintiffs' Statement, at ¶¶ 12, 36. It is apparent to the court that the Corps gave due consideration to these concerns, and that the in-lieu fee agreement in this case was approved only after the City and the Corps had spent years looking for mitigation banks with enough credits to mitigate for all of the damage to wetlands that the OMP would cause, and had not been able to find any.

This is definitely an unusual mitigation plan, but the OMP is no ordinary project. The Corps fulfilled its responsibilities under the CWA while still meeting the FAA mandated deadline that it was statutorily obligated to respect. It does not appear that the issuance of the permit was predetermined, as the court felt that the permit was in *Sierra Club* v. *Flowers*, 423 F. Supp. 2d 1273, 1287 (S.D. Fla. 2006). In fact, many of the documents that plaintiffs cite explicitly recognize the possibility that the Corps could still deny the permit altogether. AR-22710 ("While we are certainly sensitive to internal project schedules and desires on the part of the OMP, please understand that a final permit decision on our part will not be made until your mitigation program is fully defined and balanced against anticipated project impacts.")

Given all of these factors and the importance of the OMP, the court will not overturn the considered judgment of the Corps, or assume that the carefully crafted in-lieu fee will fail. The Corps is due significant deference in its judgment regarding an appropriate mitigation plan. *Airport Communities Coalition* v. *Graves*, 280 F. Supp. 2d 1207, 1227 (W.D. Wash. 2003); *Alliance for Legal Action* , 314 F. Supp. 2d at 553-554 ("[d]etermining the proper mitigation for a Section 404 permit is a task within the Corps's expertise and discretion.... The record shows

that the final wetland mitigation plan was not a rubber stamp, but a two-and-a-half-year process in which the Corps repeatedly criticized [the applicant's] submissions.").  The court finds that there is no genuine issue of material fact that the Corps acted carefully and reasonably, not arbitrarily or capriciously, in approving the mitigation plan for the OMP.

VIII.    Order

       For the reasons stated above, the motion for summary judgment of the plaintiffs [# 19] is denied.  Defendants' cross-motion for summary judgment [# 25] is granted.  This case is terminated.

Dated: February 14, 2007                                ENTER:

                                      _____

                                      JOAN HUMPHREY LEFKOW
                                      United States District Judge